## STATE v. TURNER.

No. 5896.   Decided May 6, 1938.   (79 P. 2d 46.)

*Roy F. Tygesen,* of Salt Lake City, for appellant.

*Joseph Chez,* Atty. Gen., and *Zelph S. Calder,* Deputy Atty. Gen., for the State.

FOLLAND, Chief Justice.

In the early morning of July 8, 1936, defendant, John B. Turner, shot and killed a man named Lawrence Rucker in defendant's place of business, a restaurant at 17 South Third West street in Salt Lake City. Defendant was charged with the crime of murder in the first degree but was convicted of voluntary manslaughter, an included offense. He appeals and assigns eleven errors. They are grouped and argued under four heads: (1) Insufficiency of the evidence to sustain a verdict of voluntary manslaughter or of any verdict of guilty under the information. That is, the plea interposed of self-defense was conclusively proved so that a verdict should have been directed for defendant. (2) Error in the admission of evidence of two previous transactions where defendant used a gun, which error it is claimed was not corrected by the court excluding such evidence and instructing the jury to disregard the same. (3) Error of the court in refusing to give defendant's requested instructions numbered 1 and 2, taking from the jury the charge of murder in the first degree and of murder in the second degree on the grounds there was no evidence to support either charge. (4) Error in instructions.

Defendant had operated a small restaurant on Third West street, directly opposite the Union Pacific Station, for about a year and a half prior to the time of the trouble. He employed J. E. Clark as waiter and P. G. Green as dishwasher. Both were present at the time of the shooting and were witnesses at the trial. On the night of July 7th, Turner had closed his restaurant about 9 o'clock and he and his employees had retired in their rooms above the restaurant. On that evening Lawrence Rucker, Lee Howell, and Audrey Malone had been visiting at the home of Mr. and Mrs. Brooks. At about midnight they, with Mr. and Mrs. Brooks, came to the Turner restaurant for a meal. Finding the place closed, Miss Malone, who had at one time worked for Turner, went up to his room and asked that he prepare a meal for the

party. He, with Clark and Green, immediately dressed, came to the restaurant, and prepared the meal. Mr. and Mrs. Brooks were served first. They paid for the meal and left before any trouble started. When the others finished, Rucker insisted paying for the three; that is, himself, Lee Howell, and Miss Malone, saying that he had invited them to the "party." He called for the amount of the bill, and Turner told him it was $1.65. Rucker then said he did not have any money with him and would have to go out for it. Turner said he did not trust any man outside his door. Rucker then asked Turner to go with him, which he declined. He then asked Turner to send some one with him, and Turner said Lee Howell should go with him for the money. Rucker and Howell stood up in preparation to leaving when Rucker turned and said, "I am very glad I found out what kind of a gentleman you are." He repeated this remark. At that point trouble started. The story of the conversations and transactions leading up to the tragedy varied slightly with each of the eyewitnesses. We shall briefly state the versions of the witnesses and of the defendant.

A description of the premises will aid in following the movements of the men. The outside measurements of the restaurant were 13 feet 6 inch in width in front and 17 feet 9 inches in the rear, by 33 feet 8 inches in depth. A slight wooden partition separated the kitchen from the dining room with an open doorway about in the center for communication between the two rooms. Just back of this opening was a shelf and "deal bench" about 4 feet 2 inches in height. A passageway $2\frac{1}{2}$ to 3 feet in width led around this bench on the west and south sides to the kitchen where there was a stove, refrigerator, sink, and other kitchen equipment. The dining room had a counter with five stools on the north side, with two booths and chairs and tables on the south side.

Lee Howell, who had spent a part of the evening with Rucker and was his guest at the dinner, testified that Turner was standing in the opening in the partition when Rucker made the remark about being glad that he knew what kind of

a gentleman Turner was, and Turner replied, "You God-damn crazy son-of-a-bitch, no man can come in my place of business and insult me like that." Turner then ran back into the kitchen and appeared in the doorway with a butcher knife which he used in a threatening manner. Howell then saw for the first time a pepper sauce bottle in Rucker's hand. The men were about 5 feet apart. Turner drew the knife back as if to throw it, but immediately turned back into the kitchen and reappeared with a gun in his right hand, the barrel pointed towards Rucker. Rucker was then standing in the same position he had previously occupied between the table where he had been eating and the counter. Clark, the waiter, who was standing behind the counter near its east end, said, "Do not be a damn fool, put it down and get back in there with that." Turner then backed into the kitchen and Rucker slowly followed him. Both men were then behind the partition out of sight of Howell. He heard Rucker say, "I don't believe you will shoot it." Turner said, "Don't you believe I will shoot it, huh?" Then followed the discharge of the gun. Howell testified that he then grabbed Audrey Malone, who had dived under the table, and with her ran outside the restaurant. He turned to look back and saw Rucker collapse over the counter. He testified that Rucker had some drinks before coming to the restaurant but was not drunk and did not act like he was drunk. He was not quarrelsome, cross, or mean during the evening, but was "jovial and unassuming."

Clark, the employee and waiter of defendant, testified he stood behind the counter at a point where he could see into the kitchen. He testified substantially the same as Howell except that on direct examination he said that Rucker began slowly to advance toward the kitchen with his hands to his sides, when Turner disappeared into the kitchen and returned with the knife and then the gun; and that he saw Turner display the gun over the counter or deal bench. On cross-examination he testified that Rucker started to advance toward the kitchen when Turner made the gun play. He was

asked, "Had he started to go in at all before Mr. Turner showed the gun?" Answer: "I don't think so." Question: "Mr. Rucker just stood there?" Answer: "Yes, sir." In attempting to reconcile his testimony, he later said that Rucker started to advance when Turner showed the knife but hesitated and then moved forward again when Turner exhibited the gun; that then Rucker said either, "I will make you shoot" or "I will see if you will shoot." Rucker said it two or three times on his way to the kitchen. Clark testified that he did not see Rucker raise his hand with the bottle in it. At the time of the shooting and immediately before Rucker had not had his hand as high as his shoulder or he would have seen it (the deal bench and shelf would necessarily hide the lower part of Rucker's body from view). At the time of the shot, Rucker was near the southeast corner of the deal bench in the kitchen, and Turner was 3 or 4 feet away. He did not see the pistol in Turner's hand at the time the shot was fired, although he had seen it before. After the shot was fired, Rucker slumped back against the south wall for a few seconds, straightened up and came to the doorway, and fell. The sauce bottle was in his right hand. Clark testified that Rucker during the evening acted as if drunk.

The defendant's version is substantially the same except as to some of the details. He testified that after Rucker asked to have some one go with him that he said, "Okeh, Lee, go with him," (meaning Howell) ; that Rucker then took the bottle in his hand (none of the other witnesses saw him take the bottle or saw him with it until Turner appeared in the doorway with the knife) and "started toward me" and said, "I am glad to know what kind of a ——— gentleman you are and made an action with the bottle" (no other witness heard the opprobrious epithet nor saw any threatening action with the bottle). When he went back to put the knife away and get the gun, Rucker followed him. Defendant said, "Don't come in here, Mr. Rucker," and, when Rucker got to the corner of the bench, he said, "You will not shoot me," and made an action with the bottle and said, "You ——— (a

very indecent remark), I will brave you." None of the witnesses testified to hearing this remark nor the one, "Don't come in here, Mr. Rucker." On direct examination defendant said he did not remember anything after that. He further testified that Rucker was drunk and that he feared him for that reason. On cross-examination the defendant's memory was somewhat better as to some of the details of the shooting. He testified as follows:

"Q. Did you ever come with your gun to the deal bench, and point your gun over that bench toward Mr. Rucker? A. Yes sir.

"Q. When you pointed the gun over the deal bench at Mr. Rucker, where was Mr. Rucker? A. He was still going around the southwest corner of the deal bench.

"Q. Then you didn't point the gun over the deal bench toward Mr. Rucker? A. Yes, I did.

"Q. When did you shoot him? A. After he came around the corner of the deal bench he made an action with the bottle toward me.

"Q. Show the jury again what kind of an action that was? A. After he got around the deal bench I said I had a gun pointed at him, and he said, 'You won't shoot that gun,' and made an action with the bottle.

"Q. What kind of action was it? A. He did like that (indicating).

"Q. And that frightened you so much you pulled the trigger? A. Yes sir.

"Q. Did you aim at any particular part of his body? A. No.

"Q. You didn't aim at the left side of his body? A. No sir.

"Q. You didn't aim at all? A. No sir.

"Q. You just pulled the trigger? A. Yes sir.

"Q. Of course, you were not frightened at that time at all? A. Yes sir.

"Q. Did you want to kill him? A. No sir.

"Q. What did you want to do? A. I didn't want to do anything, except I didn't want him to strike me with that bottle.

"Q. Did you want to kill him? A. No sir.

"Q. Don't you know this is a big gun? A. Yes sir.

"Q. And you knew if you shot this gun into a body of any man it would kill him? A. Yes sir.

"Q. You knew it at that time? A. Yes sir.

"Q. And still you pointed the gun toward him? A. Yes sir.

"Q. And you knew you were pointing it toward him? A. Yes sir.

"Q. And you pulled the trigger? A. No sir.

"Q. Who did? A. When I pulled the trigger I don't remember what it was hit the gun.

"Q. But you pulled the trigger? A. Yes sir.

"Q. Did you want to pull the trigger? A. No sir.

"Q. Do you want to tell the jury this was an accidental killing? A. Yes sir.

"Q. And you didn't intend to shoot this man at all? A. No sir."

Defendant marked on the map the place where Rucker stood when he was shot, but the mark places Rucker farther into the kitchen than the other witnesses. The mute evidence, which cannot be disputed, would indicate that he was at the end of the deal bench and not out in the kitchen. The bullet went through the heart, through the chest, out through the back, and struck the wall about even with the west side of the shelf and deal bench, 3 feet 10 inches above the floor and 1 foot 9 inches on the kitchen side of the board partition. The bullet had spent itself so that when it struck the wall it merely caused an indentation and fell to the floor, from which it was picked up later.

Audrey Malone testified, and her testimony was not much different from that of Howell. She heard Turner address the opprobrious remark to Rucker, but thought the argument not serious until she heard Clark say, "Put that down, don't be a damn fool." She looked up, heard the shot, saw Rucker stumble and fall, and Turner appeared at the doorway with the gun in his hand. She did not hear any swearing or vile language used by Rucker. She said Rucker had been drinking during the course of the evening, but was not drunk. At the show of violence she went under the table.

Green, the dishwasher, was in the kitchen at the sink and saw the actual shooting. He testified:

"A. Yes sir, and Mr. Turner got a knife for protection, and the man didn't move, and then he grabed his gun.

"The Court: Who grabbed his gun? A. Mr. Turner, and the man said he wouldn't use it, and he didn't have the nerve.

"The Court: What did the man say? A. He kept coming towards him, and said, 'I haven't got any money, and I told you I didn't have any money, and you will not let me get it, send somebody with me if you want to.' And he came in the kitchen first about it and when he

got in the kitchen he got this knife to protect himself, the man was so brave.

"The Court: Who kept coming? A. The man that got killed, kept coming.

"Q. Now, did Mr. Turner have the knife in his hand before the dead man came in there? A. He grabbed the knife when the man got in the kitchen, and the man wouldn't go, and he got his gun.

"Q. When the man wouldn't go, he got his gun? A. Yes, the man allowed he wasn't going to use it—didn't have the nerve, that is what he sure told him.

"Q. What did Mr. Turner do with that knife? A. He put it down when he got his gun.

"Q. And what did Mr. Turner do then? A. After he got the gun he used it. * * *

"Q. Did you see a bottle, or anything like that, in this man's hand, that came in there? A. I must tell the truth, I am sanctified—I don't remember seeing the bottle. If he had it I don't remember seeing it * * *

"Q. Did you see a bottle in this man's hand, after he went back out? A. No, I don't remember seeing a bottle at all."

Other witnesses testified, but the ones we have quoted from above were the only eyewitnesses to the shooting and the events immediately preceding it.

Defendant relies on the defense that he was justified in shooting deceased in self-defense. Our statute states the grounds for justifiable homicide as follows:

"Homicide is also justifiable when committed by any person in either of the following cases:

"(1) When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person.

"(2) When committed in defense of habitation, property or person against one who manifestly intends or endeavors, by violence or surprise, to commit a felony; or against one who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein.

"(3) When committed in the lawful defense of such person, or of a wife, husband, parent, child, master, mistress or servant of such person, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury and there is imminent danger of such design being accomplished; but such person, or

the person in whose behalf the defense was made, if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed." R. S. Utah 1933, § 103-28-10.

"A bare fear of the commission of any of the offenses mentioned in subdivisions (2) and (3) of the next preceding section, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fear of a reasonable person, and the party killing must have acted wholly under the influence of such fear." Section 103-28-11.

The substance of the statute was given to the jury in the instructions of the court, together with other instructions fairly presenting the law of self-defense. With the exception hereafter referred to, no objection is made to the court's charge. There is no serious contention made here that the defendant was attempting to defend his property or place of business from destruction or loss. His defense is that it was necessary to kill to prevent great bodily harm to himself. That, then, is the crux of this case. There is, however, no right to kill another unless there exists necessity or apparent necessity in order to prevent great bodily harm or loss of life. The question of necessity or apparent necessity was a matter for the jury to decide. The applicable rule of law was stated by this court in *State* v. *Terrell*, 55 Utah 314, 186 P. 108, 111, 25 A. L. R. 497. There the party who was shot, burglariously invaded defendant's rabbit hutches at night. Upon hearing a noise indicating that some one was stealing his rabbits and seeing that some one was moving at the hutches, defendant shot at the invader. The intruder turned out to be a boy twelve years of age who was injured in the knees by the shot. The defendant sought to defend himself under the statute above quoted. The court there said:

"While we recognize the right of the defendant to invoke the foregoing statute under the circumstances that attended the shooting of the boy, yet the fact as to whether or not there was a reasonable necessity for the defendant to use the means employed by him to prevent the taking of his property remained a question to be determined, from

the testimony, by the jury under proper instructions to be given by the court. As a matter of law in any given case homicide or an assault with a deadly weapon cannot be justified unless in the necessary defense of habitation, property, or person. If the necessity fails, the right to invoke the statute fails. The necessity need not be real; it need be only reasonably apparent, and the resistance offered in good faith, upon reasonable grounds of belief that the invasion of some right accorded by the statute is being made by the offender, and then only such force may be employed as may be reasonably required to successfully repel the invader."

The rule is stated in 13 R. C. L. 819:

"A prisoner seeking to excuse a homicide on the ground of self-defense may give in evidence any facts tending to show the character of the attack by the deceased, the intention with which it was made, and that for any other reason he had grounds to believe the killing was necessary. The sufficiency of the grounds of belief must depend upon the facts of the particular case as disclosed by the evidence, the question of sufficiency ultimately being one for the jury to determine under appropriate instructions from the court. There must generally be some act or demonstration on the part of the deceased which induced a reasonable belief on the part of the defendant that he was about to lose his life or suffer some great bodily harm. It is not sufficient that the deceased had the means at hand with which he could have inflicted the injury, if there was no act or demonstration which would indicate that he intended to do so."

In *State* v. *Sorrentino*, 31 Wyo. 129, 224 P. 420, 422, 34 A. L. R. 1477, the slain person burglariously broke into the kitchen of the defendant's dwelling house. The defendant shot the deceased as he came to the bedroom and turned the flashlight on him. The plea was self-defense. The defendant was convicted of murder in the second degree. By statute authorizing such action, the Supreme Court reversed the conviction as to murder in the second degree and affirmed it as to manslaughter. There, as here, defendant feared attack upon himself. The court, in holding the question was one for the jury, further said:

"But the right to kill is based upon the law of necessity or apparent necessity. Life may be snuffed out in the fraction of a second, but can

never be restored. The doctrine of the right to protect one's habitation gives no moral right to kill another, unless necessity or apparent necessity, for purposes countenanced by law, exists. So much has been written upon the subject under consideration that we need but refer to *Palmer* v. *State*, 9 Wyo. 40, 45, 59 P. 793, 87 Am. St. Rep. 910, and cases collected in the notes in 67 L. R. A. 529; 2 L. R. A., N. S., 66; 25 A. L. R. 508. A man has a right to prevent, in his home, the commission of a felony or the infliction on any of its inmates of a personal injury which may result in the loss of life or in great bodily harm. The right is limited to prevention; it does not extend to punishment for an act already committed. Note 67 L. R. A. 547, 550. After the deceased had entered, though burglariously, and after he was in the house, the defendant had no right to kill him for the act of entry already committed. *Horton* v. *State*, 110 Ga. 739, 747, 35 S. E. 659. The evidence shows that there was no property in the kitchen worthy of stealing, and the defendant may well be held to have known the fact. He could therefore have no right to kill deceased on the pretense of preventing a felony in that room. The right of defendant, in other words, was limited (1) to the protection of himself, (2) to prevent a felony in the bedroom and, probably, (3) to prevent the deceased from entering that room at all. The two purposes last mentioned are, however, virtually eliminated from the case, since the defendant testified that he shot because of his fear of an attack on himself. In any event, he does not claim that he feared anything else or shot for any other reason. He was not justified in shooting unless there was actual or apparent danger of loss of life or of sustaining great bodily injury. *Leach* v. *Com.*, 129 Ky. 497, 112 S. W. 595."

In this case the evidence does not compel a finding that there was an attack by Rucker upon defendant. There was a tantalizing dare which provoked Turner to shoot, but it was pre-eminently a jury question whether, under the circumstances, Rucker's conduct was sufficiently menacing to create in the mind of the defendant as a reasonable man an honest belief that the danger to him was imminent and that his action in shooting was honestly to protect himself from loss of life or great bodily harm.

There was evidence in the record from which the jury might have found that defendant was the aggressor when he uttered his threat against the deceased and armed himself with a knife and then with a gun; and also that he armed

himself and voluntarily entered into the difficulty without having been drawn therein in self-defense. The law does not excuse a defendant under a plea of self-defense where he is the aggressor or provokes the quarrel. *State* v. *Williams*, 337 Mo. 884, 87 S. W. 2d 175, 100 A. L. R. 1503. 13 R. C. L. 831, states:

"The rule is thoroughly established and in its general terms is universally recognized that a plea of self-defense cannot be sustained where the defendant shows that he was the aggressor and provoked the difficulty, or where he acted in retaliation. Neither state of facts is sufficient to show that necessity upon which the law of self-defense is based."

The rule thus stated is subject to the modification contained in the statute, section 103-28-10, R. S. Utah 1933, that, where defendant is shown to be the aggressor, to avail himself of that defense, he "must really and in good faith have endeavored to decline any further struggle before the homicide was committed."

The fact was for the jury, since there was also evidence that the deceased armed himself first by taking the sauce bottle in his hand, as testified to by the defendant. The quarrel, however, did not become menacing until defendant uttered his threat and took up the knife. The court did not err in denying defendant's motions to withdraw the case from the jury.

The court permitted, over objection, the defendant to be cross-examined as to whether he had not engaged in other "shooting scrapes." He answered in the affirmative and said in one he chased a Mr. Burgess out of his place of business with a gun, and in the other he had exchanged shots with a man named Murphy during which he, defendant, had received four bullet wounds. The cross-examination was permitted on the theory that the subject had been opened up by the defendant on direct examination by defendant's counsel asking him whether he had ever been arrested before and defendant's answer, "No." This the court thought went to the question of peace and quiet and law-abidingness

of defendant. When the question was asked by the State on cross-examination, "You have been engaged in other shooting scrapes?" counsel for the defendant objected to the question but stated that he was willing to go into the matter if defendant would be permitted to explain. The court overruled the objection and permitted the answer. Later in the cross-examination, the court saw fit to inform the defendant of his right to claim the privilege of declining to answer if he felt that his answer might incriminate himself. The defendant himself said that it would incriminate him unless he explained the whole affair. The court said, "You may explain it so far and as completely as you wish." The defendant related the two episodes on his cross-examination and fully explained the matters in detail on redirect. From his recital and explanation one would conclude that he had acted in justification and in self-defense. He was not arrested nor accused with respect to either of them. In the altercation with Murphy, defendant was shot four times. The explanation given by him showed a shooting in self-defense, and, though taken to the hospital, he was not subjected to arrest. All of this evidence was given at a morning session of the trial. After the noon recess, the court addressed the jury, calling attention to the evidence, and said:

"I instruct you at this time you are to disregard all of that evidence. That evidence has no bearing on the issues in this case, and you should disregard it. The law is that a man is to be held for trial for the specific offense for which he is charged, and that only, so you will pay no attention to it, and do not let it take a part in your deliberations in this case."

Appellant now urges that the evidence was inadmissible and that the error in its admission was not cured by the court's instructions to the jury to disregard the same. Defendant's counsel in eliciting the answer that defendant had never been arrested before opened the subject of previous arrest for cross-examination by the State. *State* v. *Fleetwood,* 111 Minn. 70, 126 N. W. 485, 827. The

scope of cross-examination is ordinarily within the sound discretion of the trial court. When a defendant offers himself as a witness, he may be cross-examined as any other witness. Section 105-45-5, R. S. Utah 1933; *State* v. *Hougensen,* 91 Utah 351, 64 P. 2d 229, 240. We do not say the trial court committed error in admitting the evidence or in withdrawing it from consideration by the jury. We do not pass on those questions. We shall assume for the purpose of this case that the trial court was correct in advising the jury that it should not have admitted the evidence and also in excluding it by instructing the jury in relation thereto. We direct our attention to the question of whether or not the admission of the evidence in view of its withdrawal was prejudicial to the defendant's rights.

The mere admission that he had been involved in previous shooting scrapes might, without more, work prejudice to the defendant with the jury, but here he expressed the wish to explain and by the court was allowed to fully explain and give his own version of each of the two transactions in which a gun was used. Instead of insisting on his objection the defendant led the court to believe he was willing to go into the subject on condition he be allowed to tell fully his own version. This the court permitted. If such was error, it was acquiesced in, if not invited, by defendant. Under these circumstances such ruling, if error, does not call for a reversal.

When we consider the evidence developed by cross-examination and redirect examination, the jury would undoubtedly gain the impression that the defendant was fully justified in what he did. Certainly, in the case where he had been shot four times by Murphy, the testimony given would wholly excuse the defendant and show that he had clearly acted in self-defense, and also that the officers had believed the same, since they did not put him under arrest. When the court directed the jury to disregard the evidence and excluded it from consideration in their deliberations, we believe the jurors would attempt to follow those

instructions. But, if there was any lingering impression in their minds, not fully excluded by their efforts to disregard it, such impression would make in favor of defendant's justification rather than to his prejudice. One of the reasons given by counsel for defendant why prejudice resulted is that by the exclusion of the evidence counsel were prevented from placing the facts of the previous "shooting scrapes" before the jury in final argument. They undoubtedly believed more was gained than lost to the defendant by admission of the evidence and that repetition in argument would be to his advantage. The argument that but for the admission of the evidence the jury might have returned a verdict of not guilty is without merit. The version of the shooting given by the defendant himself did not justify such a belief. Counsel in their brief say: "It is conceded that there is evidence to show that the defendant, Turner, fired the fatal shot during a sudden quarrel and there can be no question but that he was angry." The jury returned a verdict justified by the record in this case. After a careful consideration of the matter and a reading of the entire record, we are satisfied that no prejudice resulted by the admission and subsequent exclusion of the evidence respecting the defendant's participation in other transactions involving a display of a gun. *State* v. *Inlow*, 44 Utah 485, 141 P. 530, Ann. Cas. 1917A, 741; *State* v. *Rutledge*, 142 Minn. 117, 171 N. W. 275; *State* v. *Barone*, 92 Utah 571, 70 P. 2d 735.

Error is assigned to the refusal of the court to give to the jury defendant's requested instructions numbered 1 and 2, to the effect that there was no evidence sufficient to warrant a verdict of either murder in the first degree or murder in the second degree. Both requests were refused and the jury instructed that they might return a verdict of either murder in the first degree, murder in the second degree, voluntary manslaughter or involuntary manslaughter, or of not guilty. It is argued that before the trial court can allow the jury to "speculate upon the guilt

of the defendant as to any charge there must be sufficient evidence to establish beyond a reasonable doubt that the charged offense has been committed." Such is not the law. The law does not require that before any case be submitted to the jury that the judge must satisfy himself beyond a reasonable doubt of the guilt of the defendant. That is for the jury. It is urged further that there is no evidence from which a finding of malice aforethought can result. The statute, section 103-28-2, R. S. 1933, provides that malice "is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." Certainly, it was for the jury to find whether or not there was "considerable provocation" for the killing. That is essentially a jury question. *State* v. *Martin*, 78 Utah 23, 300 P. 1034; *People* v. *Olsen*, 4 Utah 413, 11 P. 577; *State* v. *Buffington*, 71 Kan. 804, 81 P. 465, 4 L. R. A., N. S., 154.

So the argument that the verdict was probably a compromise between jurors holding for first or second degree murder and others holding for a verdict of not guilty, while if the offense of murder in both degrees had been withdrawn the verdict would have been not guilty, is highly speculative and without merit. What was said relative to a similar argument in *State* v. *Hougensen,* supra, is quoted here:

"But when the jury found defendant guilty of manslaughter, certainly it dismissed the idea that he was guilty of first-degree murder by provoking a quarrel in order to vent his malice. It could hardly be said that it caused them to compromise on a plane more unfavorable to him than they otherwise would have done. It is difficult to visualize a mental process which would conclude that a man was killed with malice aforethought, whether under a built-up preliminary of pretended self-defense or otherwise, and then deliberately ignore that conclusion and render a verdict of manslaughter. If there was any compromise, it was because the jurors were in very grave doubt as to whether there was a deliberate premeditated killing, but thought Hougensen not free from fault in using a gun under the final circumstances of the shooting but Miller himself very provocative."

Since defendant was found guilty of voluntary manslaughter and not of murder in either first or second degree, he is hardly in a position to complain. *State* v. *Gorham*, 93 Utah 274, 72 P. 2d 656.

Appellant has argued that part 3 of instruction No. 10, given to the jury by the court, was erroneous in that the court "in effect advised the jury that it was the duty of the defendant to retreat," whereas the defendant was in his own premises and "therefore under the law had no duty to retreat."

The right of one to stand his ground when assailed in his own home has never been seriously questioned. When one is attacked in his own home, he is not required to retreat, but may stand at bay and turn on and kill his assailant if there is necessity or apparent necessity to save his own life or to protect himself from great bodily harm. 13 R. C. L. 829. The courts generally hold that a man has the same right to defend his place of business against intruders as he has to defend his dwelling. He is no more under the necessity of retreating in the one instance than in the other when he is being assailed. 13 R. C. L. 830; *State* v. *Sipes*, 202 Iowa 173, 209 N. W. 458, 47 A. L. R. 407. Retreat is not the important element in this case. The court did not instruct the jury that it was defendant's duty to retreat. The portion of the instruction above which complaint is made of was part of the statute. The statutory language is that the homicide is justifiable when it is committed in defense of "such person * * * when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury and there is imminent danger of such design being accomplished; but such person, * * * if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed."

The ground of exception stated by defense counsel at the trial was: "The basis of defendant's objection is that there

was no evidence here of there being a mutual combat." The assignment of error attacks the instruction as follows: "That the court committed error in giving part 3 of instruction number ten, inasmuch as in this case the defendant was in his own premises, and there was no duty to decline further struggle."

The grounds stated in the exception and the assignment are abandoned in the argument and reliance placed on the theory that the court told the jury it was defendant's duty to retreat. The instruction says nothing about retreating, but merely that, if the aggressor or in mutual combat, defendant must in good faith have endeavored to decline further struggle before the homicide is committed in order to avail himself of the plea of self-defense. This, of course, is true even if the struggle is in defendant's home or business premises. To decline the further struggle is not the same as retreat. Here there was no mutal combat in the sense of a fight—only words and menacing action. Defendant flourished a knife and then a gun, while the deceased held a sauce bottle in his hand. The jury would undoubtedly understand from this instruction that before defendant could justify the killing, if they found he was the aggressor, it should appear that he in good faith endeavored to decline any further wordy altercation or menacing attitude.

There was evidence from which the jury could find he was the aggressor, and there was also evidence to justify a finding that he was not. We find no error in the instruction.

Error is assigned to the failure to give defendant's requested instruction No. 11. The essential parts of this request were contained in the instructions given by the court.

The judgment of conviction of voluntary manslaughter is affirmed.

HANSON and WOLFE, and LARSON, JJ., concur.

MOFFAT, Justice (dissenting).

I dissent. There is substantially no dispute in the evidence in this case upon material facts. I think the prevailing opinion too favorably interprets the evidence on behalf of the cause of the State. Circumstances are more favorable to the defendant than the mere words used by the parties. Such conflicts as arise upon matters are collateral and because of different points of view. The defendant and appellant, John B. Turner, operated a restaurant at No. 17 South Third West street in Salt Lake City. On the night of July 7, 1936, the defendant, colored, had in his employ one J. E. Clark and P. G. Green, also colored. The usual closing time of the restaurant was about 9 o'clock p. m. Defendant and his help occupied sleeping quarters in the second story over the restaurant.

Shortly before midnight of July 7, 1936, Audrey Malone, Lee Howell, and Lawrence Rucker, the deceased, had been at the place of Mr. and Mrs. Brooks, all colored. They decided to go to the Turner restaurant for a meal. On arrival they found the place closed. Audrey Malone had at a previous time worked for Turner as a waitress and was familiar with the place. She went upstairs and awakened the defendant and his two helpers and requested the preparation of a meal for the five. Defendant and his two helpers arose, returned to the restaurant, and prepared the meal. The defendant remained in the kitchen doing the cooking. Green washed the dishes, while Clark was in the dining room waiting on tables.

Difficulties arose after the meal. Audrey Malone, Lee Howell, and Lawrence Rucker had dined at a separate table from Mr. and Mrs. Brooks. A question arose between Howell and Rucker as to who should pay for the meal. Rucker insisted that it was his treat. He had no money with which to pay. Rucker was under the influence of intoxicating liquor. This is testified to by most of the witnesses, and the

defendant, testifying in his own behalf, affirmed that Rucker became so intoxicated he was afraid of him. While the trio was still at the table, Rucker called out, asking the price of the meal. Defendant, who was still in the kitchen, advised Rucker as to the price and came out to the door between the kitchen and dining room. Rucker arose from the table and said he had no money but would go out and get it. Defendant objected to his leaving without paying for the meal, saying he did not trust any one outside of his place. Some remarks were then passed back and forth between defendant and deceased. There is some variation among the witnesses as to just what was said. None of the language on either side was of a threatening character, but insulting. After these verbal passes, the deceased picked up a sauce bottle from the table where he had been served. Defendant went back into the kitchen and reappeared at the doorway between the kitchen and the dining room with a knife in his hand. There is agreement among all the witnesses that at the time the defendant appeared in the doorway with the knife in his hand they saw the sauce bottle in the deceased's hand.

The defendant explained his action by saying that when he saw the deceased, in his drunken condition, pick up the bottle, defendant went back and obtained the knife with the idea of scaring the deceased into leaving the restaurant. Defendant raised the knife as if to throw it, but lowered it and returned to the kitchen.

Reference to a diagram of the premises used by the trial court and to which reference was made by the witnesses makes the testimony and movements of the parties easier to follow:

SOUTH __ S i d e w a l k _ _ _ _ _ _ _ NORTH

Audrey Malone and Lawrence Rucker sat at the west side of the east table of the dining room. Lee Howell sat on the east side. A lunch counter ran along the major portion of the north side of the dining room. J. E. Clark, the waiter, was, at the time the shot was fired by the defendant, behind the lunch counter. About the center of the east wall of the dining room there is a doorway between the dining room

and kitchen. Immediately behind the door from the dining room to the kitchen and crossing at right angles to this areaway, and about 2 feet distant from the doorway, is a counter with a shelf, referred to as a "deal bench." This "deal bench" prevents passage from the dining room to the kitchen or vice versa except by going around it to the south, there being a space of about 2 feet between the south end of the deal bench and the south wall of the kitchen. The stove was on the east side of the kitchen opposite the deal bench; the sink and drainboard were in the north and west corner of the deal bench, closing the areaway to the north and west of the deal bench. The bread tin, cakebox, and some cartons occupied a bench in the northeast corner of the kitchen.

After the conversation about payment for the meal and passage of remarks between defendant and deceased, and the appearance of the defendant at the door with the knife, Rucker continued to advance and the defendant returned to the kitchen, obtained a revolver from a carton in the northeast corner of the kitchen proper. Rucker advanced from the dining room, following defendant through the door, along the passageway around the deal bench, still grasping the sauce bottle in his hand. The defendant retreated to the northeast corner of the kitchen, where he secured the revolver. The evidence indicates the advance of Rucker was not rapid but continued and persistent, characterized by an air of determination. During this time the defendant warned deceased to get out of the kitchen and leave the restaurant. Rucker, however, continued to advance until he was approximately within arm's length, or striking distance, from defendant. At this point defendant fired, the bullet penetrating deceased's body. He turned, staggered back to the dining room, and fell. He was dead when the officers arrived. Defendant remained upon the premises, turned the gun over to the officers, and was taken to the police station. Without quotation, the foregoing is a delineation of what took place.

Defendant was tried on a charge of murder in the first degree. The jury returned a verdict of voluntary manslaughter. Defendant was sentenced and appeals, making eleven assignments of error. Six of these, as stated by counsel for appellant, relate to the question of whether or not defendant established a case of self-defense. The assignments are so grouped in argument and need not be separately stated. Three of the assignments relate to the question of improperly admitted testimony; one relates to the refusal of the court to give two certain requested instructions; and one to the point that there was no evidence introduced to support a verdict of first or second degree murder or the necessary elements of such offenses as set out by the law and the instructions of the court as given. Another assignment relates to the refusal of the court to grant a new trial.

It is unnecessary in this discussion to examine the other assignments, other than those relating to self-defense. From the evidence the following ultimate facts may be stated as established: Defendant was in his own place of business. He was rendering such service as is necessarily incident to one catering to the public in the line of business in which he was engaged. The deceased was one of his customers for the time being. During the evening the deceased had been drinking intoxicating liquor. By some he was said to be drunk; by others, not so. From all the evidence and the delineation of his actions, his condition was such as to make his movements menacing. A discussion was had as to the price of the services rendered. A difference had arisen as to the deceased leaving the place, allegedly for the purpose of securing the money to pay the bill, although one of deceased's party said he had offered to pay it. Whether or not deceased was attempting a subterfuge to beat the bill or whether or not defendant thought so is not material to the issues submitted to this court. The evidence establishes that the first offensive or belligerent act on the part of deceased was the picking up of the sauce bottle from the table at which he

was served, and starting towards the defendant. At no time did the defendant advance toward the dining room further than the door between the kitchen and the dining room—the first time when he announced the price of the meal, the second time when he appeared with the knife, from which position he retreated as Rucker got up from the table where he had been served, and, with the bottle in his right hand, advanced toward defendant. The deceased continued to move toward defendant, who retreated into the kitchen, laid the knife down and went to a carton north of the stove and took out the gun, coming back to near the middle of the kitchen.

Defendant testified that he asked deceased not to come into the kitchen. Other witnesses testified they did not hear defendant make that statement, or, "Do not come in here, Mr. Rucker." Under such circumstances, what one does not hear or see is of little or no weight against positive evidence of what might have been heard or seen had observation or attention been directed to such matters. Deceased continued to advance into the kitchen, toward defendant, with bottle in hand. When the two men were about arm's length apart, or 3 or 4 feet, as one witness put it, defendant discharged the gun, the resulting wound causing the death of Rucker. In so far as witnesses, aside from defendant himself, are concerned, none of them were able to say whether Rucker had the bottle first or defendant had the knife. They do say that when they saw one they saw the other. There is a total absence of evidence to show that defendant, from the time of his retreat from the dining room doorway up to the instant of discharging the gun, took any aggressive action. As I read the evidence, he was either retreating or entirely on the defensive side, and warning Rucker against advance or any aggressive action. In so far as any threatening action on defendant's part with the knife was concerned, that was abandoned when he returned to the kitchen and placed it upon the deal board. From this point on, with Rucker constantly advancing into the kitchen, was the defendant

justified in arming himself to prevent further aggression? Did he withhold fire as long as a reasonable and prudent man would be required to do under such circumstances?

Under the undisputed evidence, defendant had within his own premises retreated from the door, around the deal bench and across the kitchen, during all of which time the deceased was advancing. Defendant testified that Rucker said, "You will not shoot that gun," and that he said to Rucker as he was approaching, "Do not come in here, Mr. Rucker." Witness Clark testified he heard defendant say to deceased, "Get out of this kitchen." Other witnesses said they did not hear this warning statement of defendant, but testified that just before the firing of the fatal shot they heard Rucker say, in substance, "You will not shoot," or "I will make you shoot," or "I will see if you will shoot," or "I don't believe you will shoot."

The instructions of the trial court are silent as to whether or not the bottle in the hand of deceased at the time of the shooting was or was not a deadly weapon. When practicable, the court should declare whether a particular weapon is deadly or not. This is a question of law for the court, and not of fact for the jury, especially where there is no dispute about the facts, as in the instant case. But, where the character of the weapon in such respect is doubtful, or where the question depends upon the particular manner in which it was used, the question is one for the jury under proper instructions. *State of Nevada* v. *Davis,* 14 Nev. 407; 5 C. J. 793, § 336, and cases there cited.

The court instructed the jury that "under the law there was no duty on the part of this defendant to retreat or run away from the assault or advance made by Lawrence Rucker, if any there were, and you are further instructed that the law, under those circumstances, gives the defendant the right to stand his ground and use such force as is reasonably necessary to defend himself against the assailant, even to the point of taking human life." This instruction is a correct statement of the law, and it is difficult to understand why

the court did not take the case from the jury or set aside the verdict in the light of the evidence.

The defendant testified:

"I laid the knife down there [on the deal bench], and he kept coming and I stepped over to the table where I kept the gun, and opened the box and took the gun out of there, thinking surely he would stop if I had a gun, and he kept coming, and I asked him not to come into the kitchen, and he kept coming, and when he got in the kitchen by the corner of the deal bench, he said, 'You will not shoot that gun,' I said, 'Don't come in here, Mr. Rucker.' He said, 'You will not shoot at me,' and made an action with the bottle."

This testimony is not contradicted by any of the witnesses. Some did not hear or remember. The circumstances are in harmony with defendant's statements and corroborate him in so far as circumstances may.

The right of one to stand his ground when assailed in his own home or place of business has never been seriously questioned. The rule is practically universal that when a person is attacked in his own dwelling or place of business, he is not required to retreat and may stand his ground and, if it is apparently necessary to save his own life or protect himself from great bodily harm, he may kill his assailant. 13 R. C. L., Assault, § 135. Some might wait until they were actually struck before retaliating; some might not await the impending blow. It may not be said that one in his own domicile is rightfully required to time with strictly measured nicety the maturity of an apparently impending assault into a battery. 2 R. C. L. 551, citing *State* v. *Hickam,* 95 Mo. 322, 8 S. W. 252, 6 Am. St. Rep. 54, states the following:

"However, in the heat of conflict, or in the face of impending peril, a person cannot nicely gauge the proper quantum of force necessary to repel the assault, and he will not therefore be deemed guilty of exceeding his rights unless the force was so excessive as clearly to be vindictive under the circumstances of the case."

Under the circumstances of this case, the defendant was justified in defending himself and the homicide was justi-

fiable. Defendant had a right to protect himself and avoid a threatened bodily injury or to avoid what to him appeared a necessity to avoid great bodily harm, reasonably considered in the light of the circumstances. Defendant testified he was in present fear of the deceased because he was drunk. Section 103-28-10, R. S. Utah 1933, provides:

"Homicide is also justifiable when committed by any person in either of the following cases:

"(1) When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person.

"(2) When committed in defense of habitation, property or person against one who manifestly intends or endeavors, by violence or surprise, to commit a felony; or against one who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein."

In the case of *State* v. *Merk*, 53 Mont. 454, 164 P. 655, 658, a case in which a deceased was approaching in revival of an attack, the court said:

"He might have awaited until he received great bodily harm, but if one who is attacked must restrain himself until subsequent events determine whether the attack will result fatally or in grievous bodily harm, then the right of self-defense is one in name only. This is not the law. A person assailed may act upon appearances as they present themselves to him, meet force with force, and even slay his assailant; and, though in fact he was not in any actual peril, yet if the circumstances were such that a reasonable man would be justified in acting as he did, the slayer will be held blameless."

The cases of *People* v. *Sherman*, 103 Cal. 409, 37 P. 388, and *Perez* v. *State*, 51 Okl. Cr. 180, 300 P. 428, are substantially to the same effect.

Subsection (2) of section 103-28-10, supra, was construed in the case of *State* v. *Terrell*, 55 Utah 314, 186 P. 108, 112, 25 A. L. R. 497, where, although the one assailed turned out to be a 14-year-old boy stealing rabbits, the court said:

"As heretofore pointed out, homicide is justifiable under our statutes 'when committed in defense of habitation, property or person, against

one who manifestly intends or endeavors, by violence or surprise to commit a felony.' In this class of cases the authorities are practically unanimous that the slayer need only act upon appearances, and it is sufficient if he acts in good faith and has reasonable grounds to believe, and does believe, that under the circumstances his legal rights are being feloniously invaded and the necessity exists for the force used."

Assault and Battery, 2 R. C. L., applying the rule laid down in the case of *Scheuermann* v. *Scharfenberg*, 163 Ala. 337, 50 So. 335, 24 L. R. A., N. S., 369, 136 Am. St. Rep. 74, 19 Ann. Cas. 937, and note, states the following:

"A person may defend his dwelling house against the felonious acts of others to the extent of taking life when necessary, and inasmuch as a man's place of business is (pro hac vice) his dwelling, he has the same right to defend it against felonious intrusions, as he has to protect his dwelling. Applying these principles of law, the rule may be laid down that a person is not liable for injury to a burglar who while attempting to enter is shot by means of a spring gun placed in the dwelling house or store for protection against burglars."

2 R. C. L. par. 27, entitled, Self-Defense, pp. 548, 549, reads:

"The right of self-defense is founded in the first law of nature, the right of self-preservation, and it is not and cannot be superseded by the laws of society. Properly speaking, the right cannot include more than a defense of life and person. The first and essential element to the establishment of a perfect self-defense is the necessity for the exercise of the right, for if the alleged self-defender uses force against another where it is not necessary for his own protection he becomes an aggressor and violates the law. While it has been said that the necessity which will justify the use of force in self-defense can arise only where there is actual, imminent and apparent danger of injury to the person of the defender, yet the right to use force in self-defense cannot be limited to cases where there is in fact a real danger; and a person will not be held responsible civilly or criminally if he acts in self-defense, from real or honest convictions induced by reasonable evidence, although he may be mistaken as to the existence of actual danger. However, an assault and battery committed by one person on another cannot be justified on the ground of self-defense unless the person assaulted had at least done some overt act or made a hostile

demonstration of a character to give the assailant reasonable ground to suppose himself in imminent danger. The right of self-defense exists only so long as the danger exists, and therefore as soon as the assailant desists there can be no further need of defense, and if the person defending himself pursues his assailant after the latter has given up the attack, and inflicts injury on him, he is liable both civilly and criminally. Self-defense may justify an assault where in the heat of conflict the defendant inflicts an injury on a person other than the one assailing him, under a mistake as to the identity of his assailant. An illegal arrest is nothing more than an assault and battery, and a person thus attempted to be restrained of his liberty has the right to use the same force in defending himself as he would against any other unlawful intrusion on his person or liberty."

## Paragraph 28, pp. 549, 550, of 2 R. C. L., declares:

"The law does not permit a person voluntarily to seek or invite a combat, or to put himself in the way of being assaulted, so that when hard pressed he may have a pretext for injuring his assailant. The right of self-defense does not imply the right of attack, and it will not avail in any case where the difficulty is sought for and induced by a person by any wilful act of his, or where he voluntarily and of his own free will enters into it. The necessity being of his own creation will not operate to excuse him. It is true that statements are to be found that if one be the 'aggressor' or be 'in fault' or 'provoke a difficulty' he cannot rely on a plea of self-defense. But it is not every aggression which produces a difficulty that is unlawful, within the meaning of those phrases. Nor is it every fault a man might commit that precludes him from defending himself when violently assaulted or menaced, nor every provocation of a difficulty which robs him of the right of self-defense. It is not intended that everyone shall be held to be an aggressor who says something provoking to another, which causes a difficulty, for often such an aggression is a just one, and sometimes a necessary one; but even when it is neither just nor necessary, the use of approbrious language is not, for this reason alone, an aggression, in the sense of the law. Hence if one only uses such words, and is assaulted or so menaced, he may defend himself. After all, the aggression, the fault, or the provocation depends upon its character and its intent. If it is an assault, or the menace of one by an overt act, or the provocation of a difficulty with intent to inflict death or great bodily harm in the event it is resisted, made of malice to bring about that result and enable the provoking party to wreak his malace on the other, that is an aggression or fault and a provoking of a difficulty within the legal sense and meaning of the

terms. Where a person is himself violating the law and on account of his own wrong is placed in a situation where it becomes necessary for him to defend himself against an attack, then the law justly limits his right of self-defense, and regulates it according to the magnitude of his own wrong. Where, however, a person has in good faith abandoned his intention to inflict injury on another and is retreating, he is entitled to defend himself if pursued and attacked. The burden of proof does not rest on the defendant in establishing a plea of self-defense to show that he was free from any fault."

In 2 R. C. L. 551, we find the following statement and cases cited:

"Generally stated the force that one may use in self-defense is that which reasonably appears necessary in view of all the circumstances of the case, to prevent the impending injury. *Riddle* v. *Brown*, 20 Ala. 412, 56 Am. Dec. 202; *Adams* v. *Waggoner*, 33 Ind. 531, 5 Am. Rep. 230; *Brubaker* v. *Paul*, 7 Dana (Ky.) 428, 32 Am. Dec. 111; *Morris* v. *Miller*, 83 Neb. 218, 119 N. W. 458, 20 L. R. A. (N. S.) 907, 131 Am. St. Rep. 636, 17 Ann. Cas. 1047; *Stevens* v. *State*, 84 Neb. 759, 122 N. W. 58, 19 Ann. Cas. 121; *State* v. *Scott*, 142 N. C. 582, 55 S. E. 69, 9 L. R. A. (N. S.) 1148; *McQuiggan* v. *Ladd*, 79 Vt. 90, 64 A. 503, 14 L. R. A. (N. S.) 689; *Fink* v. *Thomas*, 66 W. Va. 487, 66 S. E. 650, 19 Ann. Cas. 571."

We are not at variance as to the law. The application of the evidence in the instant case, as made by the prevailing opinion, would make every case of self-defense a case for the jury. Had Mr. Rucker been advancing toward a peace officer, either in a public or a private place, who was in the performance of a duty to arrest, and had done just what defendant did, it is more than probable the cause would not have got beyond a preliminary hearing or a coroner's inquest. There may be times when it is a close question as to whether a case of self-defense has been so clearly established as to say it is an abuse of discretion to permit the cause to go to the jury or to be taken away. The line of demarcation must be maintained, otherwise, no matter how clearly the defendant establishes self-defense, if the matter that a homicide has occurred must be regarded as creating a conflict of

evidence sufficient to take the cause to the jury, self-defense as a matter of law ceases to exist.

I am of the opinion that defendant established a case of self-defense, and the court, under the law applicable to the case and in view of the evidence submitted, should have taken the cause from the jury, or, not having done so, a new trial should have been granted.