## STATE v. TERRELL.

No. 3377.  Decided Dec. 2, 1919.  (186 Pac. 108.)

1. BURGLARY—RABBIT PENS MAY BE BURGLARIZED. Rabbit pens in a back yard permanently constructed for the purpose of housing rabbits are embraced within the kind of structures that may be burglarized, under Comp. Laws 1917, section 8259.  (Page 321.)

2. ASSAULT AND BATTERY—JUSTIFICATION OF ASSAULT WITH DEADLY WEAPON. The same rules of law are applicable with respect to justification in cases of assault with a deadly weapon with intent to do bodily harm as in cases of homicide, and one accused of such an assault may invoke Comp. Laws 1917, section 8032, relating to justifiable homicide.  (Page 321.)

3. ASSAULT AND BATTERY—JUSTIFICATION IN DEFENSE OF PROPERTY. In a prosecution for assault with a deadly weapon with intent to do bodily harm, accused having shot one burglarizing his rabbit pens, the fact as to whether or not there was a reasonable necessity for the shooting under Comp. Laws 1917, section 8032,

was a question to be determined from the testimony by the jury under proper instructions.   (Page 321.)

4.   ASSAULT AND BATTERY—HOMICIDE—FORCE MUST BE REASONABLY NECESSARY TO CONSTITUTE JUSTIFICATION.   Homicide or an assault with a deadly weapon cannot be justified under Comp. Laws 1917, section 8032, unless in the necessary defense of habitation, property, or person, and, if the necessity fails, the right to invoke the statute fails, and, although the necessity need not be real, it must be reasonably apparent, and the resistance offered in good faith, upon reasonable grounds of belief that the invasion of some right created by the statute is being made by the offender, in which case only such force may be employed as may. be reasonably required to successfully repel the invader, in view of section 8033 and section 8561, subd. 2. (Page 321.)

5.   ASSAULT AND BATTERY—HOMICIDE—JUSTIFICATION AT COMMON LAW.   Under the common law, the rule was that homicide or an assault with a deadly weapon could not be justified in the defense of habitation, property, or person, unless there was an actual necessity for the act.   (Page 322.)

6.   CRIMINAL LAW—INSTRUCTIONS AS TO JUSTIFIABLE HOMICIDE ERRONEOUS.   In a prosecution for assault with a deadly weapon with intent to do bodily harm, instructions defining burglary, and stating that "one may kill to save life or limb or prevent a great crime,   *   *   *   but not to restrain commission of a misdemeanor," and "a felony is a crime which may be punishable with death or imprisonment in the state prison," and that "every other crime is a misdemeanor," were erroneous, where the court failed to state whether burglary constituted a "great crime," a felony, or a misdemeanor, or whether burglary was punishable by imprisonment in the state's prison, but instructed that larceny is "a secret crime not attended with force," and the "killing of one person by another or the attempt to kill to prevent, larceny of a small amount, such as petit larceny, is not justified"; the complaining witness having been shot while burglarizing a rabbit pen.   (Page 324.)

7.   CRIMINAL LAW—REFUSAL TO GIVE REQUESTED INSTRUCTION CONCERNING JUSTIFICATION ERROR.   In a prosecution for assault with a deadly weapon with intent to inflict bodily harm, defendant having shot another who was burglarizing his rabbit pen, a request for an instruction, "If you believe that when complaining witness, R., was shot he was committing a burglary and stealing defendant's rabbits, then defendant was justified in shooting," although such instruction could not have been properly given without a qualification, rendered it error for the court not to

give the substance of such instruction with proper qualifications. (Page 325.)

8.   HOMICIDE—INFANTS—JUSTIFICATION FOR SLAYING CHILD.   Notwithstanding Comp. Laws 1917, sections 1829, 7915, a child between 7 and 14 years of age may violate the law and commit an offense against person or property the same as an adult person and it cannot be said as a matter of law that such a child cannot be shot in defense of habitation, property, or person under section 8032, subd. 2.   (Page 326.)

Appeal from District Court of Salt Lake County, Third District; *John F. Tobin,* Judge.

Dennis F. Terrell was convicted of an assault with a deadly weapon with intent to do bodily harm, and he appeals.

REVERSED and REMANDED, with instructions to grant a new trial.

*Olson & Lewis,* of Salt Lake City, for appellant.

*Dan B. Shields,* Atty. Gen., and *O. C. Dalby, Jas. H. Wolfe,* and *H. Van Dam, Jr.,* Asst. Attys. Gen., for the State.

CORFMAN, C. J.

The defendant was charged by the information in two counts:   (1) Assault with intent to commit murder; and (2) assault with a deadly weapon with intent to do bodily harm. A plea of not guilty was entered to each count of the information, and upon the trial the defendant was convicted of an assault with a deadly weapon with intent to do bodily harm, and was sentenced by the court to an indeterminate term of imprisonment after denial of motion for a new trial.   Defendant appeals.

The assignments of error complained of on the appeal are based entirely upon certain instructions given and the failure of the court to charge the jury as requested by the defendant. In substance, the testimony shows:   That the defendant, Dennis F. Terrell, is a barber by trade, but prior to May 17, 1918,

the day upon which the offense with which he was charged and convicted occurred, was engaged in the work of a street car conductor. He owned a home in the southwestern part of Salt Lake City, which he occupied with his family. Situated upon his city lot or home premises, besides a dwelling house, were several sheds, a toilet, chicken run, and rabbit pens within an enclosure fenced with posts and woven wire. Between the inclosure and the portion of the premises occupied by the dwelling and other out-buildings an open alleyway extended east and west. Within the inclosure above referred to were a couple of sheds situated at the southwest corner, abutting on the alleyway. The doors to the sheds opened to the north. North and to the east of the sheds were the rabbit pens with their doors opening to the south. There was an open space through the inclosure about ten feet wide between the rabbit pens and the sheds, and beyond the sheds to the east this open space was approximately twenty feet in width. The entrance to the woven wire inclosure was from the west, by a swinging gateway, near the doors at the northwest corner of the sheds. Seventeen feet east of the westerly fence line of the inclosure and northeasterly from the doors of the sheds the rabbit pens were constructed, extending easterly for a distance of thirty feet. The rabbit pens were connected and built in tiers, for the most part two and three tiers in height, their roofs tilting to the north. They were built largely upon 2x4 sills with the same materials supporting the roofs, with no uprights except one-inch boards nailed to the sills and 2x4 supporting the roofs. The testimony of the state's witness, the county surveyor, was to the effect that the rabbit pens, as constructed, have no indication that they were portable or designed to be moved; that they covered the space of ground there, and apparently were permanently constructed for the purpose of housing some sort of animal, and not designed to be moved from place to place. The county surveyor also testified that there was a street light, at a height of twenty-five feet from the ground, about 250 feet east and 150 feet north from the southeast corner of the defendant's property, which, in his judgment, would cause a shadow to be cast in the night-time

across the space intervening between the rabbit pens and the chicken run situated immediately to the east of the sheds within the inclosure. The defendant, on May 17, 1918, the day he is charged with the offense complained of, was, and for some time prior thereto had been, engaged in raising and selling rabbits, and had at times sheltered as many as sixty rabbits in the pens. He testified that for some time prior to May 17, 1918, he had been missing rabbits from the pens, and that in order to catch the intruder or thief he had been sleeping in the shed at the southwest corner of the inclosure. On the above date, at about 10 o'clock in the evening, he undressed himself at his dwelling, put on a bathrobe and went out to the inclosure where the rabbit pens were, examined the doors and their latches, ascertained that the rabbits were secure in the pens, and then retired upon a cot in the shed at the southwest corner of the inclosure. Shortly after retiring he heard voices in the alleyway leading through his premises. After hearing the voices he heard no further sounds until he heard the rabbits jumping or pounding with their feet. As to what followed, the defendant testified:

"When I heard the first noise with the rabbits, I just raised up; must have been asleep, I guess. And then I heard one of them squeal, I got out of bed. I got out of bed, and I had an old wire fastened on the door nailed on the inside to hold it shut, to keep the wind from blowing in and keeping me awake at nights. I unwrapped the wire off the nail and pushed the door open. I had a gun standing there in reach. I went in the open doorway and looked and saw the door of the rabbit pen open, the east hutch. I did not realize at the time whether it was the east hutch or the second one, but I noticed one of them standing open, and when I did, I was fully convinced of the fact that some one was stealing my rabbits, and I took up my gun and looked, and I thought I saw some one moving, and when I did I shot. I pointed the gun down low intentionally. I didn't intend to hit any person that was there in any vital part, but purposely aimed low. When I shot, there was no outcry, no noise made. I was standing with one foot in the shed and one foot out, and I heard no one after shooting, and I looked and could see no one, or hear anything, and I came to the conclusion I must have been mistaken, that I had been too slow in getting out, and they had got away, so I started to walk over toward the rabbit pens slowly, and when I got over well past the shed on the south where the ground is raised on the west end where it first starts to

raise, just as I had my foot on that, a voice from the ground said 'Mister, will you please help me up?' I looked, and I could hardly distinguish the form that was lying on the ground, but the voice when I heard it brought to me the awful fact that it was a boy. I didn't think, I never had the least thought or any kind of intimation before that time, that it was a boy. I said to him, 'Get up yourself.' I really thought I had not hit anything when I shot, even after he spoke and I said, 'Get up yourself,' and he said, 'I can't; my knees hurt.' I walked over to him and put my hands under his shoulder and helped the boy up. * * * I put my left arm around him and put my gun in my right hand, and helped him to the house, and put him on a chair. When I turned on the light, I saw black socks on him that were dyed, so I took the socks down and got into my clothes, and went across the street to a neighbor's and phoned the Emergency Hospital, and told them what I had done and to get down as quick as possible. I reported to the police department. When I went over to the pens first, the door on the east pen was open, the only one that was standing open. The latch on the next one was turned straight up and down, so it could open and that one would not stay open unless it was held open because the hinges are heavy leather and swing shut when they are released. The east one will stand open. When I got over there, there were two rabbits on the ground out of the pen. One was running along to the west, and the other one hopped across in front of me toward the chicken house. When I went to investigate the rabbits that were in the pen, there were five in one pen and four in the other. Two of them I saw on the ground. * * * In my judgment, it was necessary to shoot that night under the circumstances, not knowing who it was that was out there at the time, and the fact that I never realized, never once thought, that it was a boy that had been taking my rabbits, it became necessary to that extent that I was under the impression that there was more than one there, and that I was going up against somebody that perhaps was prepared to take a shot at me or something, in case I let them know I was there. I didn't think that it was a boy that stole the rabbits the nights before April 30th, and not a man. I thought I was in physical danger at the time that I shot from the fact that somebody was stealing my property, if I should go out and say anything to them or let them know that I was there. I shot because of the fact that if I hit them they would not be able to put up much of a fight, and it would stop them from taking my property, and it would lessen my physical danger. I wanted to be sure they didn't take a shot at me. It was absolutely necessary for me to shoot, although, as it turned out afterwards, it would not have been necessary. I was thoroughly satisfied at the time, or at least I thought I was, not being able to distinguish who or what it was at the rabbit

pens. Not for a positive fact, I couldn't see any one. There was an object of some kind moving, and I shot at it."

Ray Cowan, the complaining witness, a boy twelve years of age, testified that he and a younger brother on the day of the offense complained of had been visiting with their parents at the home of an aunt residing south and west of the defendant's premises; that upon leaving their aunt's residence between nine and ten o'clock in the evening they separated from their parents and taking a short cut homeward passed through the alleyway on the Terrell premises. The younger brother became frightened at some shadows, and thereupon they turned back into the alley. In passing through the alley over defendant's premises the witness, Ray Cowan, was attracted to the rabbits, and he opened the gate leading to the inclosure, passed in and to the rabbit pens, opened the doors to the easterly pens for the purpose, and was in the act of petting the rabbits, and not acting with any purpose of stealing them, when he was shot in the knees by the defendant, from the front door of the west shed.

Other witnesses testified that the boy, after the shooting, admitted that he intended to take rabbits. The boy denied having made the admission.

After the shooting occurred and the boy had been taken to the Emergency Hospital a rabbit was found in his waistcoat, but the boy denied any knowledge as to how it came to be there.

The theory of the defense was that the shooting was justifiable under the circumstances; that the boy was engaged in the commission of a burglary, and therefore the defendant had the right to shoot to prevent him. The state contends that the boy was only a trespasser, or at most his conduct, under all the circumstances, regardless of whether or not it was his intent merely to pet the rabbits or to steal them, would not justify the defendant in shooting him.

As we read the record, there was no question raised before the trial court as to the character of the rabbit pens, not being the kind of buildings or structures that might be burglarized under the statute if broken and entered into for the purpose

of committing larceny. However, it is contended by the state on the appeal that the pens were not such structures within the meaning of the statute as might be burglarized. In so far as may be material for the purposes of the consideration of the case on appeal. Section 8259, Comp. Laws 1917, provides:

"Every person who, in the night-time, forcibly breaks and enters, or without force enters an open door, window, or other aperture of any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse, or other building, or any tent, vessel, water craft, or railroad car, with intent to commit larceny or any felony, is guilty of burglary in the second degree."

In view of the foregoing statute, we think the theory on which the trial court proceeded in treating the rabbit pens as embraced within the kind of structures that may be burglarized was the right one.

It was an admitted fact that the defendant shot and inflicted great bodily injury upon the boy, Ray Cowan. It is also conceded that the same rules of law are applicable with respect to justification in cases of assault with a deadly weapon with intent to do bodily harm as in cases of homicide. Under the provisions of our statute, and in so far as may be material to the case under consideration, subdivision 2 of section 8032, Comp. Laws 1917, provides that homicide is justifiable "when committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony." The appellant invokes the foregoing statute in making his contention that his act in shooting the boy was justifiable; that the assault was made while the boy was in the act of committing larceny; that larceny committed under the circumstances here, within the meaning of section 8259 of our statutes, quoted above, constituted the crime of burglary; and that burglary is a felony.

While we recognize the right of the defendant to invoke the foregoing statute under the circumstances that attended the shooting of the boy, yet the fact as to whether or not there was a reasonable necessity for the defendant to use the means employed by him to prevent the taking of his property remained a question to be determined, from the

testimony, by the jury under proper instructions to be given by the court. As a matter of law in any given case homicide or an assault with a deadly weapon cannot be justified unless in the necessary defense of habitation, property, or person. If the necessity fails, the right to invoke the statute fails. The necessity need not be real; it need be only reasonably apparent, and the resistance offered in good faith, upon reasonable grounds of belief that the invasion of some right accorded by the statute is being made by the offender, and then only such force may be employed as may be reasonably required to successfully repel the invader.

Under the common-law doctrine the rule was that there must have been an actual necessity for the act, but under the statutes and the decisions of the courts of the several states this rule has been modified, and it is now generally held that homicide is justifiable if there exists in the mind of the slayer a reasonable belief that the necessity exists. Wharton on Homicide, page 767, sections 515, 516; 13 P. C. L. p. 807, section 112; 1 Michie on Homicide, p. 319, section 107. Something more, however, is required under our statute than a bare fear on the part of the slayer that an offense is about to be committed against his habitation, person, or property. Section 8033 provides:

"A bare fear of the commission of any of the offenses mentioned in subds. 2 and 3 of the preceding section [8032], to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted wholly under the influence of such fears."

The degree of force that may be exercised in preventing the commission of an offense against property must necessarily vary according to the situation of the parties and the circumstances surrounding a given case. It is expressly provided by subdivision 2 of section 8561 that sufficient resistance may be exercised by a person "to prevent an illegal attempt by force to take or injure property in his lawful possession." We think this statute necessarily negatives the right to exercise any greater degree of force or resistance in any case than may be reasonably necessary to repel the offender or

prevent the commission of the crime that is being undertaken. Again, the question as to whether or not in a given case a greater degree of force by way of resistance was exercised than was reasonably necessary becomes one of fact to be determined by the jury under proper instructions of the court. In view of the situation of the parties, the condition and circumstances surrounding the defendant at the time of the alleged illegal assault, as disclosed by the testimony in the case before us, we can readily appreciate that the trial court may have met with considerable difficulty in seeking to properly charge the jury in matters of law applicable thereto. In that regard the defendant assigns as error the refusal of the trial court to give the following request:

"You are instructed that the taking of human life is justifiable when committed by any person in defense of property against one who manifestly intends or endeavors by violence or surprise to commit a burglary, and you are further instructed that every assault with intent to kill and every assault with a deadly weapon with intent to commit bodily harm or any lesser assault is justifiable under the same circumstances."

It is conceded that the foregoing request correctly states the law, but it is contended by the state that the instructions of the court given on this point were, in substance and effect, the same, and that therefore the request was properly refused.

The court charged that—

"In so far as material in this case, burglary is defined to be when any person in the night-time forcibly breaks and enters, or without force enters, an open door, window, or other aperture in any barn, stable, outhouse, or other building with intent to commit *larceny*." (Italics ours.)

The court then proceeded to further charge:

"One may kill to save life or limb, *or prevent a great crime,* * * * but one is not justified in killing to restrain or prevent the commission of a misdemeanor." (Italics ours.)

The court also instructed that "a felony is a crime which is or may be punishable with death or imprisonment in the state prison," and that "every other crime is a misdemeanor." The trial court failed to tell the jury whether or not the crime of burglary constituted a "great crime," a felony or a misdemeanor, or whether or not burglary was punishable

by imprisonment in the state prison. Further, the jury was told that larceny is "a secret crime not attended with force," and the "killing of one person by another, or the attempt to kill to prevent larceny of a small amount, such as petit larceny, is not justified." Then again the court failed to tell the jury what constituted the offense of petit larceny.

We think that under the facts and circumstances as disclosed by the record in this case the instructions, unexplained, as thus given by the court, were not only erroneous, but highly prejudicial to the substantial rights of the defendant. They most certainly would tend to confuse and befog     6 the minds of the jurors to the real issues to be determined by them in the case. Well might the jury have believed, under the instructions as given, that unless property intended to be taken was of great value, the owner might not lawfully resist the commission of the burglary under any circumstances to the extent of the force used by defendant. They might have very readily assumed that burglary did not constitute a felony; that larceny, or the taking of another's property unless of great value, under no circumstances would constitute the crime of burglary, and that the defendant's plea of justification was wholly without merit and not entitled to any consideration under the instructions as given them by the court.

The defendant also complains that the court erred in the refusal to instruct as follows:

"If you believe from the evidence that at the time the complaining witness, Ray Cowan, was shot, he was committing a burglary and engaged in stealing the defendant's rabbits, then the court instructs you that under the law the defendant was justified in shooting the person so engaged in burglary."

The foregoing instruction without any qualification is not the law. We have heretofore pointed out and endeavored to make clear that under our statutes the taking of life is justifiable only when reasonable necessity exists for it, to prevent the commission of the crimes enumerated in our statute with reference to justifiable homicide, that the facts and circumstances attending a particular case must govern and deter-

mine the necessity, and that the courts cannot lay down a hard and fast rule that will be controlling in all cases.

As we view the testimony in this case, the defendant was not entitled to have the request given in form presented to the court without such a qualification that would enable the jury, in their deliberations, to determine, after due consideration of all the attending circumstances, whether or not the defendant was justified in resorting to the extreme measure of shooting the complaining witness in order to prevent a burglary. We do not wish to be understood, however, that the giving of the defendant's request last above referred to would be error when accompanied with the further explanation on the part of the court as to when and when not, according to the situation of the parties and their surrounding circumstances, so high a degree of force may be legally exercised to prevent the commission of the crime of burglary. In other words, we hold that the requests of the defendant heretofore made correctly stated the law, and the court should have given them in substance and effect, not as abstract rules of law, but in conjunction with such other clear and concise statements of the law applicable to the facts and circumstances as were disclosed by the testimony in the case. We think the trial court failed to do this in the particulars pointed out, and that such failure was prejudicial to the interests of the defendant in having a fair trial, and therefore the judgment of conviction should not stand.

There was some contention made on the part of the Attorney General for the state, both in the oral and in his written argument before this court, to the effect that the complaining witness, being a minor, twelve years of age, was not chargeable with the crime of burglary, and therefore from every viewpoint of the case the defense of justification on the part of the defendant should be held unavailable. The Attorney General has cited us to no authorities on the question raised, and, if we correctly understand him, he does not seriously insist that his contention in this regard is the law, but that the question is a new one and ought to be now passed

upon by this court. In this connection our attention is called to Comp. Laws Utah 1917, section 7915, which provides:

"All persons are capable of committing crimes except those belonging to the following classes:

"1. Children under the age of seven years;

"2. Children between the ages of seven years and fourteen years, in the absence of clear proof that at the time of committing the act charged against them they knew its wrongfulness."

(Also other classes not material here.)

It will be seen that under subdivision 2 of the foregoing statute children between the ages of seven years and fourteen years are presumed to be incapable of committing crime. However, the presumption is a rebuttable one, and may be overcome by testimony tending to show that he was mentally capable or actually appreciated the wrongfulness of his conduct. So far as the act itself is concerned, a child may violate the law and commit an offense against person or property the same as an adult person. When an offense such as burglary is committed by a child under eighteen years of age, it is deemed a "delinquent child," and is chargeable before and dealt with by our juvenile courts. Comp. Laws 1917, section 1829, provides:

" 'Delinquent child' shall include any child eighteen years of age or under such age, who violates any law of this state, or any city or town ordinance, or who commits an offense not punishable by death or imprisonment for life."

As heretofore pointed out, homicide is justifiable under our statutes "when committed in defense of habitation, property or person, against one who manifestly intends or endeavors, by violence or surprise to commit a felony." In this class of cases the authorities are practically unanimous that the slayer need only act upon appearances, and it is sufficient if he acts in good faith and has reasonable grounds to believe, and does believe, that under the circumstances his legal rights are being feloniously invaded and the necessity exists for the force used by him in the prevention of crime. Michie on Homicide, section 116, p. 374, vol. 1; N. O. & N. E. Ry. v. Jopes, 142 U. S. 19, 12 Sup. Ct. 109, 35 L. Ed. 919.

We are of the opinion that the principles announced by the

foregoing authority, and in the case cited from the United States Supreme Court, are of universal application, and should be adhered to in the consideration of the defendant's plea of justification in the case at bar.

For the reasons heretofore given, the judgment must be reversed, and the cause remanded, with instructions to the court below to grant a new trial.

It is so ordered.

GIDEON and THURMAN, JJ., concur.

WEBER, J., being disqualified, did not participate herein.

FRICK, J.   I concur with the Chief Justice in the view that the instructions of the district court are incomplete and were thus calculated to mislead the jury to the prejudice of the defendant.   I am, however, not prepared to concede that under defendant's own version of the shooting of the little boy he, as a matter of law, was justified.   Our statute (Comp. Laws Utah 1917, section 8032, subd. 2) only justifies the taking of human life when done "in defense of habitation, property, or person, against one who manifestly intends or endeavors, *by violence or surprise, to commit a felony,*" etc. (Italics mine.)   The statute clearly requires that in order to justify the taking of human life there must be some actual, or at least threatened, violence or surprise.   Merely to imagine or suspect that another is about to steal property, when the habitation is not being assailed in any way, does not justify the slaying of the intruder as I understand the law.   Our statute is merely a declaration of the common law.   See 1 East's Pleas of the Crown, 271.   The only difference between the rule at common law and the rule under statutes like ours is that the danger need not be real or actual under the statute, but need only be reasonably apparent to the slayer.   It is not sufficient, however, for the slayer merely to say that the danger appeared actual or real to him.   Unless it appears from all the facts and circumstances in evidence that the slayer had good or sufficient cause to believe that there was imminent

danger, he may not take life with impunity. The rule in that respect is well illustrated by the Supreme Court of California in the case of *People* v. *Glover,* 141 Cal. 238, 239, 74 Pac. 745. To the same effect is *People* v. *Walsh,* 43 Cal. 447. In the latter case, like in the one at bar, the shooting was without any challenge or investigation of any kind, and it was there held not to have been justified. In the case at bar the defendant did not even know that there was any one in fact at the rabbit boxes, and he shot without the slightest effort to ascertain whether there was in truth and in fact any one committing an act of violence or any other act. Under such circumstances I think the jury should at least be told that, unless the defendant had good cause to believe, and in good faith did believe, that some person was in fact committing an act of violence, and was by that means manifestly attempting or endeavoring to commit a felony, the shooting would not be justified.

In *Pond* v. *People,* 8 Mich. 177, Mr. Justice CAMPBELL, in his usual forcible style, states the law under a statute like ours in the following words:

"Where a felonious act is not of a violent or forcible character, as in picking pockets, and crimes partaking of fraud rather than force, there is no necessity, and therefore no justification, for homicide, unless possibly in some exceptional cases. The rule extends only to cases of felony; and in those it is lawful to resist force by force. If any forcible attempt is made, with a felonious intent against person or property, the person resisting is not obliged to retreat, but may pursue his adversary, if necessary, till he finds himself out of danger. Life may not properly be taken under this rule where the evil may be prevented by other means within the power of the person who interferes against the felon. Reasonable apprhension, however, is sufficient here, precisely as in all other cases."

To the same effect is *Weaver* v. *State,* 19 Tex. App. 568, 53 Am. Rep. 389, where it is said:

"Where a felony is threatened, the party may repel it, whether leveled at him or others; 'but the force of defense must be proportioned to the force of attack. It is but reasonable that the kind and amount of defense should be measurably proportioned to the amount and kind of danger.' 'A bona fide belief by the defendant that a felony is in process of commission, which can only be ar-

rested by the death of the supposed felon, makes the killing excusable homicide.' Whart. on Hom. section 533; Desty's Amer. Crim. Law, sections 125d, 126d.

"But 'to justify the defensive destruction of human life the danger must be not problematical and remote, but evident and immediate.' *Aldrich* v. *Wright*, 53 N. H. 398 [16 Am. Rep. 339]. 'The attempt must not be merely suspected, but (reasonably) apparent; the danger must be (apparently) imminent, and the opposing force or resistance must be necessary to avert the danger or defeat the attempt.' * * * 'The law holds the life of man in the highest regard. And only in extreme instances of wrongdoing, and impelled by an extreme necessity, can another take it innocently away.' "

In Kerr, Law of Homicide, at section 185, the law is tersely and correctly stated in the following words:

"Homicide in defense of property is excusable when necessary to defeat or prevent the commission of a forcible or atrocious felony thereon, but under no other circumstance."

In *Driggers* v. *United States*, 7 Ind. T. 761, 104 S. W. 1169, the court charged the jury as follows:

"The jury are instructed that justifiable homicide is the killing of a human being in self-defense, or in the defense of habitation, property, or person, against one who manifestly intends or endeavors by violence or surprise to commit a felony on either. A bare fear of any of these offenses is not sufficient to justify the killing. It must appear that the circumstances, viewed from the defendant's standpoint, as they reasonably appear to him, were sufficient to excite the fears of a reasonable man, and that the defendant acted upon these reasonable appearances of danger."

That instruction, it was held by the court, stated the law correctly under a statute precisely like ours. Take the defendant's own testimony in this case: Where is there the slightest evidence of force or violence exerted by the boy which would excite fear in any reasonable man? Again, in what way was there any surprise? The defendant was not, and could not have been, surprised so as to excite fear in him. He was actually standing guard with a loaded gun. If any one was surprised in this case, it was the little boy who was shot. The law is not that the owner may shoot an offender merely because the owner discovers the latter in the act of taking the former's property. Unless there is some act of violence or surprise accompanying the act, which gives the

owner reasonable cause to fear personal injury, he may not shoot the offender. If the owner of property may ruthlessly kill the offender merely because the latter is found stealing property, when neither force nor violence is used so as to cause or justify fear in the owner of the property, then such owner may kill any one on sight whom he suspects of intending to take—that is, to steal—his property. Such in my judgment, is not the law, and the jury should be so instructed in plain language. Nor do I think that the question of whether the little boy was committing a burglary by what he did is here for review. The court in its instructions merely assumed that the boxes placed upon one another as described in the evidence and in which the rabbits were kept constituted an outhouse or a building within the purview of our statute. The state saved no exception to the court's charge and has assigned no error in that regard. The instruction of the court, right or wrong, therefore, constituted the law of this case so far as the jury were concerned. While I am not prepared to say that the rabbit boxes placed as they were did or did not constitute an outhouse or building within the purview of our statute, yet, that question not being before us, I express no opinion upon it.