## STATE v. LAW.

No. 6619. Decided February 1, 1944. (147 P. 2d 324.)

See 30 C. J. Homicide, sec. 580; 26 Am. Jur. 249.

[1]*State* v. *Turner*, 95 Utah 129, 79 P. 2d 46.

*Harley W. Gustin,* of Salt Lake City, and *M. Earl Marshall,* of Tooele, for appellant.

*Grover A. Giles,* Atty. Gen., and *A. U. Miner,* Asst. Atty. Gen., for respondent.

WOLFE, Chief Justice.

Appeal from a judgment based on a verdict of guilty of voluntary manslaughter.

The information alleged that on the 15th day of March, 1943, in the County of Salt Lake, State of Utah, defendant murdered Martin Bruce Bogarte. At the close of the State's evidence, the appellant rested his case and requested the trial court to direct the jury to return a verdict of acquittal. The request was denied. The case went to the jury, and a verdict was returned finding the appellant guilty of voluntary manslaughter.

The defendant's request, so made at the close of the State's case, was upon the ground that "from all the evidence and without contradiction, it appeared that the homicide complained of was justifiable or excusable," and that the jury should find a verdict of acquittal. The request was based upon Sec. 103-28-12, U. C. A. 1943, which reads:

"When the homicide appears to be justifiable or excusable, the person charged must, upon his trial, be fully acquitted and discharged."

There is but one question presented. Does the evidence show that as a matter of law the homicide was excusable or justifiable? The evidence was all produced by the State.

The killing occurred in the foyer of the Regis Hotel in Salt Lake City. The foyer is approximately 14 feet east and west. On the west it is separated by a partition from the hallway on to which give sleeping rooms No. 1 to No. 6. This partition forms the west wall of the foyer for a distance of approximately 18 feet. The east wall is approximately

12½ feet. The north end is open giving access to stairways going up and down.

The killing occurred about 6:30 a.m. on March 15th. The defendant and the deceased Bogarte were guests at the hotel. Just prior to 6:30 a.m. the defendant, together with Charles D. Powers, chief witness for the State, and one Jack Allred were sitting in what we have called the foyer or lobby, above described, on the second floor of the building. While there they engaged in some horse play which evidently disturbed Bogarte. He came north along the hallway and around the end of the partition and profanely berated the three. At that time the defendant was sitting on the east end of a davenport located at the south wall of the foyer, approximately 21 feet from the end of the partition around which Bogarte appeared. Bogarte evidently stopped near the northwest corner of a table which was approximately 2½' x 4', the long side of which paralleled the davenport. According to the testimony of Powers, the only witness who testified to the happenings, the defendant must have gotten up and first gone to the east side of the table. Allred, brushing aside or going around the defendant, said "this is my affair. I am going to take care of this." The defendant, as we glean from the record, left the east side of the table going to a point marked "C" which, as shown on the diagram drawn to scale by witness Tipton, was near the stairway going to the third floor, outside of the lobby proper. He then came back to the west end of the table near Bogarte. Powers' testimony of the course of events, omitting repetitions and nonsignificant details, is as follows:

"Well, Bogarte kept bawling with his language. Of course Allred used some language then, he was using a little bad language himself, * * * Bogarte continued to cuss at both of them * * * he didn't seem to pay any attention to me, I wasn't paying any attention to him, but Ed Bogarte did keep cussing the two of them. Well, Law stepped around back of in front of him, kind of leaned up against the west end, toward the west end, facing north on this, of the table. Wasn't sitting on it, sort of leaning against it."

The history of events in the form of questions and answers

as taken from the record from the time defendant left the point "C" will be found in the dissenting opinion of Mr. Justice Moffat. Hence, no purpose would be served in repeating that part of the record here.

The testimony is that Bogarte was a well muscled man, weighing at least 220 pounds, "six feet easy" and a powerful strapping man. Powers "would judge Law to weigh 125 pounds and about five feet six" in height.

The appellant's position is that in view of the disparity in the size and strength of the two men and the situation that appellant found himself with deceased on top of him choking and striking him, he was entitled as a matter of self-preservation to "blast" his way out by all possible means; that under the circumstances the use of the knife in the manner it was used was legally justifiable or excusable; that hence under 103-28-12, U. C. A. 1943, he was entitled to an instruction directing the jury to acquit him. Subsection (3) of Section 103-28-10, U. C. A. 1943, specifies that:

"Homicide is also justifiable when committed by any person * * * when committed in lawful defense of such person * * * when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury and there is imminent danger of such design being accomplished; but such person * * * if he was the assailant or engaged in mutual (sic) combat, must really and in good faith have endeavored to decline any further struggle before the homicide is committed."

Subsection (1) of the same section makes homicide justifiable "when resisting any attempt to murder * * * or to do great bodily injury upon any person." These two subsections interlock. Subsection (1) covers the case where one kills to prevent the murder of or the doing of some great bodily injury upon "any person." "Any person" includes the person who commits the homicide as well as other persons who are attacked with murderous intent or intent to do them great bodily injury. Hence subsection (1) has meaning in determining the matter of self-defense. Subsection (3) however is more directly conerned with usual

cases of self-defense and defense of one's family. Subsection (1) comes into play when there is no doubt as to the attempt to commit a felony, or attempt to murder or inflict great bodily injury on the person of the defendant or some other party. Subsection (3) makes the killing justifiable when committed in defense of self or *certain* others not only when the person killed was in the process of committing a murder or a felony or of doing great bodily harm but when "there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury and there is imminent danger of such design being accomplished." Subsection (1) requires that the defendant establish the fact of the deceased's actual attempt or fact that he was in the process of murdering, committing a felony, or inflicting *great* bodily harm to defendant or another. Subsection (3) limited to defendant and certain of his relatives or household, only requires that the facts be so that there is reasonable ground for apprehension of a design to commit a felony or do some great bodily harm on or to the persons named in the action and imminent danger of its accomplishment plus the defendant's state of mind that he apprehended such accomplishment. The defendant in this case could take advantage of either subsection as he could claim that not only was there reasonable ground to apprehend a design to do great bodily injury to him with imminent danger of such design being accomplished but that it was actually in the process of being accomplished. But whether the defendant was justified in using a knife on the theory that Bogarte was attempting to murder him or do some great bodily harm upon his person is in this case a question for the jury. Likewise whether he had reasonable ground to apprehend a design on Bogarte's part to do him some *great* bodily injury and that there was imminent danger that he would accomplish it, and his belief that such was the case is also, under the facts of this case, a question for the jury.

Unless the evidence is so conclusive that every reasonable

mind must say that the means and the force used were necessary to defend against aggression the question of whether the killing was in self-defense is a question for the jury to determine. Warren on Homicide, Vol. 3, par. 314, p. 528 and notes thereunder.

"Whether the defendant had reasonable ground to believe that the deceased was about to take his life or do him great bodily harm * * * whether it was his duty to resort to other means of defense; whether he properly exercised his right of self defense; whether he used unnecessary force in killing his adversary; whether he was justified in using a deadly weapon when struck by fist or otherwise assaulted in a manner not likely to cause serious bodily harm * * * whether he and deceased engaged in a mutual or willing affray; whether he or decedent brought on the fatal encounter where there is a conflict in the evidence, are questions for the determination of the jury." Warren on Homicide, supra, and copious notes on concrete cases in connection therewith.

Likewise, if there is no conflict in the evidence but there is room for reasonable minds to differ as to whether "there is reasonable ground to apprehend a design to * * * do some great bodily injury and there is imminent danger of such design being accomplished," the question is one for the jury.

In this case Law was a small man and Bogarte a large man. The latter had the former down and was on top of him. But at the time the knife was used, Allred was slugging Bogarte and had his leg over the latter's hip. Before that "Bogarte was trying to choke Law with both hands and hit him at the same time; seemed like he tried to choke with both hands, then tried to choke with one hand and hit with the other; quite a scuffle, and that was as near as I could see." Certainly it was for the jury and not for this court to say whether Law reasonably apprehended the imminent accomplishment of great bodily injury which would justify the use of a knife. Life is not so cheap that one may use weapons on another which are quite likely to cause death unless the danger of being overcome is so great as to justify their use. That is usually a question for the jury and was pre-eminently so in this case.

Certainly there is nothing to show how successful Bogarte was in choking Law. He evidently took one hand from his throat to strike him. The testimony is not that he was choking Law but that he was *trying* to choke him and *trying* to hit him. And after Bogarte rolled off of Law it appears he had no difficulty in arising. The fact that Law looked dazed and wild and quite upset appears to be as attributable to his consciousness that he had cut Bogarte as it is to the effects of the scuffle. On cross-examination the witness was asked if Law looked like he had been hit and he answered: "He had a terrible expression on his face. You might call it dazed." This indicates that the witness intended to convey the idea that the defendant was aghast at what he had done rather than that he was dazed from being hit. The matter of self defense, that is, whether the homicide was justifiable, was clearly a question for the jury. *State* v. *Turner*, 95 Utah 129, 79 P. 2d 46.

In addition to what has been said above, attention should be called to one significant bit of evidence which would give the jury considerable ground for believing that Law had opened his knife and had it ready before he was struck. When Bogarte came around the end of the ∎ partition which separated the hallway from the foyer and then to the northwest corner of the table, the defendant was seated on the east end of the davenport, well out of Bogarte's reach. He could see Bogarte was a powerfully built man, considerably heavier than he, yet he arises from this place of comparative safety and goes to the east side of the 3½ foot table. He is still fairly well out of reach. But while Allred and Bogarte were fuming against each other he walked over to a point which Powers marked as point "C" on the map drawn by witness Tipton and introduced as Exhibit A. Point "C" is really outside of the lobby by the steps going to the third floor. Yet because the lobby is open on the north side a person at point "C" could be seen by any one in the lobby. Point "C" is the last place where Powers saw Law before the latter returned to the table where he was slugged by Bogarte. Point "C," from

Powers' testimony, is fully 12 feet from the position where Bogarte was standing. Powers testified that the last time he saw Law before the latter came back to the place of danger, that is, within striking distance of Bogarte, he, Law, was at point "C." The evidence is that about 10 seconds elapsed between the time that Allred pushed Law aside and the time when witness Powers saw him coming back toward the table. The jury might well have wondered why Law had gone over to Point "C" and it might have readily come to the conclusion that while walking away from Bogarte and the table he got his knife from his pocket and carried it back opened. The knife is in evidence as Exhibit "E." It has a sharp 3½ inch blade pointed at the business end. This blade was the one used. It has on it what appears to be dried blood. It is difficult to see how Law with Bogarte astride of his hips could have reached in his pocket, gotten out the knife, and opened the blade, and if he did so why it would not have been seen. If he could have gotten it out of his pocket it would have required two hands to hold and open it. If there was room enough between his and Bogarte's body to bring both hands together and open the blade it would seem that Bogarte, looking down at him would have seen the movement. If he made his hands meet around Bogarte's powerful body, granted he could reach around while the latter's torso was far enough away to slug him and while he engaged in that movement, it is unlikely that the action would not have been seen and the shiny blade observed even in the dim light of the lobby. The full length of the knife with the fatal blade open is almost 8 inches. The fact that a small sized man left a place of safety, walked to the table, was requested in effect by Allred to leave Bogarte to him, and then walked far enough away with his back to the three in the lobby, after which he returned to a point where he was within striking distance of a powerful man who weighed about 100 pounds more than he did, becoming then bold enough for the first time to challenge him, when he had before evidently been willing to accede to Allred's implied request that he keep out of it, coupled with the difficulty of getting

the knife from his pocket and opening it while he was so held down would support a strong inference by the jury that he came to the table with the open knife concealed along his hand and arm. Powers testified that he did not see the knife but he also testified that he was not looking for a knife. It "never occurred to me." And if the defendant did succeed in getting hold of and opening the knife while Bogarte was astride of him the jury could well infer that his position was not so desperate as to require him to use it especially since Allred was astride of Bogarte.

Certainly if Law came to the place of danger with an open knife he could hardly plead self-defense under the latter part of Subsection (3) of Section 103-28-10, U. C. A. 1943 above quoted. He may have intended only to use it in case of necessity but the jury could find that he created the necessity if indeed necessity there was. The jury under those circumstances might well have found him guilty of voluntary manslaughter if not of second degree murder. The judgment is affirmed.

McDONOUGH and WADE, JJ., concur.

LARSON, Justice (concurring).

I concur in affirming the judgment. But I do not concur in some rationale of the CHIEF JUSTICE, nor in much that is said in the opinion. Under the statute hereinafter referred to and the decisions of this and many other courts, one need not await until he is choked before he seeks to save himself. Nor do I think that attempts to draw distinctions between such expressions as "A was choking B" and "A was *trying* to choke B" make for sound judicial determinations. Nor do I think the record justifies this court in inferring or concluding that the jury inferred or may have inferred that Law went out in the hall, opened his knife, and came back into the foyer, and then placed himself in a place of danger so as to have an opportunity to use the knife.

I arrive at my conclusion that the judgment should be affirmed strictly upon the following grounds. The element of self-defense, or justifiable homicide is predicated upon two propositions: (a) That the circumstances and surroundings were such that a man *might* reasonably believe he was in imminent peril of death or great bodily injury. (b) That the actor did actually believe he was in such danger. Section 103-28-10 sets forth five different situations when homicide is justifiable. Subsection (1) applies to cases where the person who commits the homicide was not involved in the crime which the deceased was attempting to commit when slain. In other words, the deceased's felonious attempts were not directed at the person who did the killing; and the killing was in defense of another, not of the family. Subsection (2) deals with homicides in defense of habitation or property or persons therein against violence. Subsection (3) is the self-defense section for the defense of self and family and household. Subsection (4) allows killing in the heat of passion over defilement of a female relative of defendant; and subdivision (5) justifies a killing while lawfully attempting to apprehend a felon or to preserve the peace.

Here we are concerned with subsections (1) and (3). The former is to justify any one in interfering to prevent the completion of an attempted felony, even to the extent of taking life. It does not involve an element of danger or fear to the person who commits the homicide. It may be done very deliberately and calculatedly. But subsection (3) is based upon the element of fear and defense of self and family. It is founded upon a recognition of the fact that "blood is thicker than water" and that a sense of danger to a loved one is an overpowering force which leads one to act quickly and to do things one would otherwise not normally do. The situation sometimes distorts the vision and impairs the judgment, for which fact the law makes due allowances.

"When committed in the lawful defense of such person * * * when there is reasonable ground to apprehend a design to commit a

felony or do some great bodily injury and there is imminent danger of such design being accomplished."

Under the common law doctrine, the rule was that there must have been an actual necessity for homicide; but under statutes such as ours, the decisions have modified this rule, and it is now generally held that a homicide is justifiable if the accused acted as a reasonable man with apparent good cause for shooting. *State* v. *Molitz,* 40 Utah 443, 122 P. 86; the necessity for homicide need not be real but need be only reasonably apparent, that is, based upon reasonable grounds of belief that such is the case. *State* v. *Terrell,* 55 Utah 314, 186 P. 108, 25 A. L. R. 497. Section 103-28-11, U. C. A. 1943, states the rule as follows:

"A bare fear of the commission of any of the offenses * * * is not sufficient * * *. But the circumstances must be sufficient to excite the fear of a reasonable person, and the party killing must have acted wholly under the influence of such fear."

I think the circumstances shown by the record are such that they might well excite the fear of a reasonable person, in Law's position, that Bogarte intended to do him some great bodily injury, and that he could accomplish it. But I do not think the record compels such a finding. A person in Law's position would not be unreasonable in such fear, but neither would he have been unreasonable if such fear was not excited in him. But there is no evidence that Law did fear great bodily injury, or that he acted wholly or at all under the influence of such fear in using the knife. Any conclusion that he so acted must be drawn or inferred from the circumstances surrounding him at the time of the cutting. Since as indicated above the circumstances do not compel such conclusion, the question becomes one for the determination of the jury. There was no error therefore in denying defendant's motion for a directed verdict.

MOFFAT, Justice (dissenting).

The appellant was accused of the crime of murder in the first degree. It was alleged that on the 15th day of March,

1943, in the County of Salt Lake, State of Utah, he murdered Martin Bruce Bogarte. Upon the trial concluded on April 21, 1943, at the close of the State's evidence, the appellant rested his case and requested the trial court to direct the jury to return a verdict of acquittal. The request was denied. The case went to the jury, and a verdict was returned finding the appellant guilty of voluntary manslaughter.

The defendant's motion, so made at the close of the State's case, was made upon the ground that from all the evidence and without contradiction, it appeared that the homicide complained of was justifiable or excusable, and that the jury should find a verdict of acquittal.

The question is also raised that the verdict of the jury and judgment are not supported by, but are contrary to the evidence. There is but one question presented for answer. Does the evidence show that as a matter of law the homicide was excusable or justifiable? The evidence was all produced by the State. There is no contradiction.

Five witnesses testified. The facts as shown by the record are: Dr. C. R. Openshaw examined the body of deceased and said death was caused by a knife wound that severed the femoral artery; that deceased bled to death. William Y. Tipton, of the City Engineer's Office, identified a plan sketch of a space on the second floor of the Regis Hotel, the site of the homicide. Fred Kingston identified the pocket knife which he received from the witness Powers. J. W. Spencer told of the arrest and the condition of the clothing of defendant at the time of the arrest, that it was bloody, manifestly from the wound inflicted on Bogarte while Bogarte was still on top of Law. Charles D. Powers was the only witness who testified to the details of the attack made by Bogarte upon Law.

Shortly before 6:30 on Monday morning, March 15, 1943, the defendant David Law with the State's witness Charles D. Powers and a man by the name of Jack Allred were sitting in what is referred to as the "foyer" or lobby. This is a space on the second floor. In this space there was a writing desk, a table, a divan and two large chairs. The diagram

prepared by Tipton is here reproduced. It is not claimed that the diagram shows the location of the furniture at the time Bogarte attacked Law but as he found it at the time he made the survey:

LOBBY OF REGIS HOTEL

Shortly before Bogarte attacked Law, Allred was asleep in one of the chairs. Hailstone, a clerk of the hotel, on one of his trips through the space took a glass from the table and poured some water down the back of Allred's neck. Allred started "cussing Cliff Hailstone, and he hauled off and slapped him in the back of the neck."

Bogarte came out of his room down the hall and around the partition into the foyer. Purcell and Hailstone are not again referred to in the record. Powers testified that Bogarte "started cussing Allred and Law * * * calling all of us 'God damn sons-a-bitches' * * * bastards * * * and a few other names, just as bad." Allred challenged Bogarte "and was going to fight him." "Allred squared off to fight with him. He said, 'This is my affair, I am going to take care of this,' and brushed Dave Law aside, or behind him. * * * Bogarte continued to cuss at both of them."

As to Powers' testimony, he being the only witness testifying who saw the fight, giving an account in detail, beginning with the position of the parties just before Bogarte entered, we let the record speak:

Purcell was sitting in Chair "A," Powers was sitting on the west end of the divan, Law was sitting on the east end, and Allred was sitting in Chair "B." Then follows what occurred after Bogarte entered:

"Q. Will you come down, please, and indicate to the jury the point where that 'C' is located? (Witness goes to blackboard.)

"Q. That is, the 'C' is about where you saw Law before he came to the table? A. That's right.

"Q. And he was over there—go ahead. A. It was just sort of shuffling over, didn't seem to be in any hurry, or anything; just shuffling over toward the table again.

"Q. Now, he was at Point 'C' before or after Allred told him this was his fight? A. Beg pardon?

"Q. I say, was—did you notice Law at this point we have marked 'C' before or after Allred told him this was his fight, if I make myself clear. Which happened first, Allred brushed him aside, or you saw Law over at Point 'C'? A. I saw him brush him aside, then I saw him at about the Point 'C' afterwards.

"Q. Then he came over to the table—what is marked 'Table'? A. Yes—oh, kind of mosied over toward and leaned up against the table, or backed up against the table.

"Q. Where was he facing, with relation to Bogarte? A. Directly in front of him.

"Q. Where was Bogarte from the table, which direction? A. He was just about a straight angle from the northwest corner of the table.

"Q. All right now, after Law got there what happened? A. Well, Law asked him, told him, he said, 'You have been looking for trouble around here, you big stiff, you have been looking for trouble around here for a long time' so what—As I remember, those were the only words that were spoken.

"Q. Then what happened? A. Then I stepped up there, put a hand on Bogarte's arm or chest, I wouldn't say which, told him, said, 'Go on back to bed.' Said, 'I will go to bed, we will all go to bed, and cut out this trouble, this noise or racket.' He took one look at me. He looked back at Law, and took a punch at him.

"Q. Hit him? A. He hit him, all right. So—

"Q.? Did you notice where? A. I couldn't say whether he hit him square, or not; it all happened too fast.

"Q. Then what happened after this blow was struck? A. They went to the floor with Law down, with his head up against the west end of the table, Bogarte down on top of him.

"Q. And then what happened? A. Well, Bogarte was trying to choke him and hit him at the same time, seemed like he tried to choke with both hands, then tried to choke with one hand and hit with the other; quite a scuffle, and that was as near as I could see.

"Q. Where was Law with relation to Bogarte's body? A. Well, he was laying flat on his back, and Bogarte was directly right on top of him. Their faces were perhaps not any farther than that apart * * * And perhaps just about facing—just about pretty near straight up.

"Q. Was any part of Bogarte's body on the floor? A. Well, his knees, toes.* * *

"Q. And where were Bogarte's hips with relation to Law's body, if you noticed that? A. Bogarte's hips was—don't know so much about that, they were quite, directly over him. He was astraddle his knees. Bogart's legs were straddle of Law's.

"Q. Then what happened after they got in that position? A. Well, it all happened so fast and furious, I couldn't see everything. The light is poor in there, anyway, but Allred threw a leg over Bogart's hips and started slugging him, and 'Picking on my pal, will you, you big son-of-a-bitch' was his words, and he started slugging him, and next thing I knew the big fellow seemed to kind of release Law, or something, and what his intentions were, I don't know, but he rolled over backwards, said something about 'Oh, cutting,' were the two words I remember. With that, I decided someone must have a knife, and I looked closely, and took the knife out of Mr. Law's hand.

"Q. And in what position was Mr. Law at that time? A. At that time he had—as Bogarte had rolled over backwards he had got up onto his knees, and that kind put him sort of astraddle of Bogarte's knees.

"Q. And what did you do when he was in that position? A. I would say he was straddle of Bogarte, just above his knees. He might have had one leg between Bogarte's and straddling maybe one of them, but that is as near the position as I could describe.

"Q. What were you doing? A. What was I doing?

"Q. Yes, what did you do then, when Law got in that position? A. I rushed down, took the knife out of his hand and took off down to the cafe on Broadway, called the officers, with the knife in my fingers.

"Q. I hand you what has been marked State's proposed Exhibit 'B,' and will ask you, Mr. Powers, if you can identify that knife? A. That is the knife.

"Q. You say this is? A. Yes sir, it is the same thing, that is—

"Q. Will you indicate, which hand did Law have the knife in when you took it? A. His right hand.

"Q. Would you indicate—hold this knife and indicate the position in his hand that the knife was when you took it? A. I wouldn't remember whether it was this way or this way, but it was one or the other.

"Q. The blade was sticking out from which side of the hand? A. Just like that.

"Q. That would be the thumb side of the hand? A. That is right, or it might have been that—I don't remember—I know I took hold of the blade like that, holding his wrist in my right hand. I told him to give me that knife, 'Give me that knife, Dave.' I told him two or three times. He looked at me, dazed, and a wild look in his face, quite upset, I guess, or excited. He opened his hand and let me have it."

On cross-examination Powers testified that when Law was standing at the table "his hands were at his sides," he "didn't see any knife" and that he did not know whether Bogarte knocked Law down with a blow "because as soon as he hit him * * * he grabbed him" and "they fell with their heads up at the end of the table, the west." They did not change position while on the floor "and Law was underneath Bogarte" when he heard something about "cutting."

Powers stated Bogarte "was a big man, it was a powerful blow," he "would judge Bogarte to be two hundred twenty

pounds or more"; that he "would judge Law weighs one hundred twenty-five" and is "about five foot six" in height; that Bogarte was "six feet, easy" and a powerful, strapping man, and when on the floor he was trying to choke Law sometimes with both hand and sometimes with one, and "blowing him somewhere around the face" with the other. When Powers was asked, "But you didn't have any difficulty in taking the knife from" Law, he answered, "No, he handed it to me, he opened his hand."

As stated above, the evidence is uncontradicted. It establishes a case of unprovoked and vicious assault and battery by a large, powerful man upon a small man who was physically no match for his assailant. The smaller man was down, helpless, and beaten into a "dazed" condition when the knife was used. Desperation from fear or taking a last chance while consciousness remains does not permit of a deliberate selection of means or place of delivering a blow of resistance, or a measurement of what the consequences may be.

The cases of State v. Terrell, 55 Utah 314, 186 P. 108, 111, 25 A. L. R. 497, and State v. Turner, 95 Utah 129, 79 P. 2d 46, are cited. Both of these cases differ from the case at bar. Terrell was charged with assault with intent to commit murder. He had been missing rabbits from his pens. In order to catch the thief he had been sleeping in a shed in the enclosure where the rabbits were kept. After he had retired he heard a noise amongst the rabbits. He heard one of them squeal. He got out of bed picked up his gun and looking out saw the doorway to the rabbit pen open. Being convinced someone was stealing his rabbits, and having seen someone moving by the opened door to the rabbit pen, he pointed the gun in the direction, fired and wounded a boy. The jury found Terrell guilty. On appeal the cause was reversed and returned for a new trial. In reversing the verdict and judgment, the court said [55 Utah 314, 186 P. 110, 25 A. L. R. 497]:

"It is also conceded that the same rules of law are applicable with respect to justification in cases of assault with a deadly weapon with intent to do bodily harm as in cases of homicide."

And:

"As heretofore pointed out, homicide is justifiable under our statutes 'when committed in defense of habitation, property or person, against one who manifestly intends or endeavors, by violence or surprise to commit a felony.' In this class of cases the authorities are practically unanimous that the slayer need only act upon *appearances*, and it is sufficient if he acts in good faith and has reasonable grounds to believe, and does believe, that under the circumstances his legal rights are being feloniously invaded and the necessity exists for the force used by him in the prevention of crime." (Italics added.)

The instant case differs upon the facts from the Terrell case, but the doctrine quoted is applicable. When one is assaulted, overpowered by another of greater strength, weight and ability in combat, and is knocked or thrown down, with the assailant on top of the person assaulted, and chok- and beating is proceeding upon one unable to defend by ordinary means and is rendered dazed by the attack, what may such a person do to keep within the limitations of "justifiable or excusable" action, no other means appearing available than the means used?

In the Turner case the assault was threatened but had not reached the stage of a battery or combat when the shot was fired resulting in the death of the party taking the threatening position, even though the defendant was on his own premises and had retreated considerably.

The prevailing opinion cites and quotes part of Sec. 103-28-10, U. C. A. 1943. It appears to me that the part of that section applicable to the evidence in the instant case required an acquittal. The following covers the situation as revealed by the uncontradicted evidence:

"Homicide is also justifiable when committed by any person in either of the following cases: * * * (3) * * * when there is reasonable ground to apprehend a design * * * to do some great bodily injury and there is imminent danger of such design being accomplished; but such person, * * * if he was the assailant * * * must really and in good faith have endeavored to decline any further struggle before the homicide was committed."

In the instant case Law was not the assailant. Bogarte was. Law had no opportunity to decline. He never started the matter. It was purely a matter of being knocked down and either then defending with such means as were available or permitting an assailant to commit such bodily injury as the attacker chose to inflict. Mere empty hands gave no reasonable means of repelling the assailant. Under the evidence Law was helpless except for the means used. How much choking, how much bodily beating must a reasonable person take before he arrives at a situation where it may be said as a matter of law that a homicide is justifiable or excusable? Surely, when an unoffending person, as the evidence shows Law was, is being assailed and a violent battery is in progress upon his body, accompanied by choking, there is reasonable ground to apprehend great bodily injury. The evidence shows the battery had passed the stage of reasonable apprehension. Law was actually beaten to a condition such that the witness stated he appeared dazed. The evidence justifies the conclusion that he was, or, if not, he was different from what most men would have been under the described circumstances.

I ask any reasonable man with the odds against him such as were against Law, whether he would conclude there was reasonable ground to apprehend a design to commit great bodily harm to or injury upon his person? The great probability is that Law did not intend nor expect that his act would result in homicide. He was a man in an extreme situation, and desperation prompted self-preservation.

It is said in the prevailing opinion that,

*"The defendant in this case could take advantage of either subsection [103-28-10, U. C. A. 1943] as he could claim that not only was there reasonable ground to apprehend a design to do great bodily injury to him with imminent danger of such design being accomplished but that it was actually in the process of being accomplished."* (Italics added.)

Thus far I am in accord with the prevailing opinion. The

sentence following the one above quoted raises the barrier I am unable to get over. It is said:

"But whether the defendant was justified in using a knife on the theory that Bogarte was attempting to *murder him* or do some great bodily harm upon his person *is in this case* a question for the jury." (Italics added.)

It is then said:

"Likewise whether he had reasonable ground to apprehend a design on Bogart's part to do him some *great* [italics in prevailing opinion] bodily injury and that there was imminent danger that he would accomplish it, and his belief that such was the case is also, under the facts of this case, a question for the jury."

The question of apprehension of a design, the question of bodily injury, the question of imminent danger, and the question of belief had passed the stages of apprehension, design, imminence and belief; they were all accomplished facts when Law struck with his only apparent means of defense.

I ask what else could Law have done? Had he been a spitting cobra he might have spit in Bogarte's eyes; had he had a gun, he might have shot Bogarte. A 125-pound man down on the floor with a 200-pound assailant on top of him chocking and striking with his fists, does not give the underman much choice of means of self-defense. This affray started with a sneak punch. So did the attack on Pearl Harbor.

Again, the prevailing opinion says:

"Unless the evidence is so conclusive that *every reasonable mind* must say that the means and the force used were necessary to defend against aggregation the question of whether the killing was in self-defense is a question for the jury to determine."

Warren on Homicide is then quoted, and then follows the statement:

"Likewise, if there is no conflict in the evidence but there is room for reasonable minds to differ as to whether 'there is reasonable ground to apprehend a design to * * * do some great bodily injury

and there is imminent danger of such design being accomplished,' the question is one for the jury."

In the instant case there certainly is *no* conflict in the evidence. Law was not the aggressor. There was no willing or mutual combat or affray. The attack by Bogarte under the evidence was unprovoked, unjustified, vicious, and in violation of every right a person has to occupy a peaceful, peaceable, passive position of observing events without participation therein.

It may be said, and fairly, that the balance of the court is reasonable upon this proposition and that I am open to the charge of being unreasonable. I am, however, compelled, in being true to my own convictions, if the law is as laid down in the prevailing opinion, to reassert what I said in my dissenting opinion in the case of *State* v. *Turner*, supra, that every case of self-defense becomes a case that must go to the jury. If such is the law, I should abide by it; but as long as self-preservation is the first law of nature, as long as the statutes of this State provide, "When the homicide appears to be justifiable or excusable, the person charged must, upon his trial, be fully acquitted and discharged" (Sec. 103-28-12, U. C. A. 1943), then I must maintain that in this case under the evidence, whether the case is one of law so that the court should have taken it from the jury, or, the court having failed in what I conceive to be its duty, then the jury was required to find from the evidence that from the appearances the homicide was "justifiable or excusable," then, upon his trial, it was a miscarriage of justice to fail to fully acquit and discharge the defendant.

A case from Massachusetts has some pertinent language, *Commonwealth* v. *Barnacle,* 134 Mass. 215, 45 Am. Rep. 319:

"If the assailant is a child, or a weak and effeminate man, much inferior in strength to the party assaulted, and unarmed, common experience teaches us that there is no cause to apprehend serious danger from the assault. On the other hand, if the assailant is a large and powerful man, whom the assaulted party could not successfully resist by his unaided strength, this fact would naturally create in his mind

an apprehension of danger, which might justify him in using a deadly weapon for self-defense. Certainly it must be competent to show that the assailant was armed with a deadly weapon; for the same reason, it may be shown that he is armed by nature with a superior size and strength, which makes his attack irresistible and dangerous."

In *State* v. *Jennings*, 96 Mont. 80, 28 P. 2d. 448, 451, 121 A. L. R. 375, a conviction of second degree murder was reversed because of the exclusion of certain evidence relating to prior viciousness of the deceased. The deceased, the aggressor in the affray resulting in his death, was a large, powerful man, over six feet tall and weighing 200 pounds, while the defendant was 5 feet 6 inches tall and weighed 155 pounds. Death resulted from knife wounds inflicted by the defendant in a scuffle following the attempt of deceased to strike defendant with a cuspidor. In the course of the opinion, it is said:

"As was said by this court in *State* v. *Merk*, 53 Mont. 454, 164 P. 665, 657: 'The right of self-defense has its foundation in the law of nature'; it is recognized by our Penal Code (section 10965, Rev. Codes 1921), and, 'if it appeared to the accused at the time of the homicide, as a reasonable person, that it was necessary for him to slay his assailant in order to save his own life or prevent receiving great bodily harm, he had a right to act upon such appearances, and slay his assailant, although he was in no actual danger.' *State* v. *Rolla*, 21 Mont. 582, 55 P. 523, 525.

"The deceased was the aggressor, and, although it subsequently developed that he lost his weapon while striking the first blow, that fact shown on the trial did not deprive the defendant of his right of self-defense, under the foregoing rules. Where the assailant is a much larger and stronger man than the defendant, the latter may reasonably apprehend great bodily harm, even though his assailant is unarmed. *Hill* v. *State*, 94 Miss. 391, 49 So. 145. Here the defendant testified that he believed the deceased was endeavoring to push him against a hot stove."

The case of *State* v. *Gordon*, 191 Mo. 114, 89 S. W. 1025, 1027, 109 Am. St. Rep. 790, is strikingly similar in its facts to the instant case, except the assailant did not succeed in knocking Gordon down by the blow with his fist. Gordon was the smaller and lighter man and physically no match

for his assailant. After striking him in the temple, his assailant held him with one arm around his neck and with the other choked him. Neither went to the floor. Gordon stabbed his assailant. He was tried, convicted and appealed. The case was reversed because the trial court modified some instructions. The court quotes the instructions before being modified and holds the giving of the modified instructions was reversible error. The instruction as held by the Missouri court to correctly state the law is as follows:

"If the defendant had reasonable cause to believe, from the words, acts and conduct of the deceased, that he had a design to do him some great personal injury, and that such design was about to be accomplished, then defendant had a right to act on appearances, and to cut or stab deceased * * * to prevent the accomplishment of such design; and in this connection the jury are further instructed that defendant was not required to nicely gauge the force used, but that he could use any means that appeared reasonably necessary under the circumstances. Neither is it necessary to this defense that his danger should have been real or actual, or that it should have been impending and about to fall; but if he had reasonable cause to believe, and did believe, these facts, and cut the defendant to prevent such expected harm, then you must acquit on the ground of self-defense."

In the course of the opinion the court said:

"We think it is clear that when one is assaulted by another and he neither brought on nor voluntarily entered into such a difficulty with a view to take advantage of a quarrel begun between him and his opponent, he does not forfeit his right of self-defense by voluntarily resisting the assault made upon him; and if the circumstances are such that, when thus assaulted he has reasonable cause to believe and does believe that his opponent then and there entertains a design to kill him or do him some great bodily harm, and there is imminent danger of the accomplishment of such design, then he may resist the accomplishment of such a purpose by killing his adversary to prevent the accomplishment of such a purpose."